JAMES W. MUIRHEAD *vs.* FAIRLAWN ENTERPRISE, INC.

JULY 26, 1946.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

164

CAPOTOSTO, J. This is an action in assumpsit for breach of contract. A jury in the superior court returned a verdict for the plaintiff in the sum of $15,840. Defendant's motion for a new trial was heard and denied. The case is before us on defendant's exceptions to the denial of its motion for a directed verdict, to the denial of its motion for a new trial, and to rulings during the trial.

No rights of creditors or other third persons are involved in this case. The following facts are admitted or undisputed:

The original name of the defendant corporation was Muirhead Garage, Inc., which name was duly changed to Fairlawn Enterprise, Inc. on June 9, 1939. The corporation was organized in 1924 by the plaintiff, his mother and two brothers. The authorized capital stock was 500 shares with a par value of $100 a share. All shares were issued, each of the incorporators receiving 125 shares. In 1939, when the parties began their negotiations in the matter now before us, the plaintiff owned 375 shares and his brother, Archibald Muirhead, owned 125 shares. The latter is not a party in interest in this case as he transferred his shares to the plaintiff in the course of the dealings here involved.

When negotiations between the parties began in 1939, the corporation owned a brick building in the city of Pawtucket. A fifty-car garage, fully equipped, four stores and two tenements in this building then yielded a total rent of about $350 to $370 a month. This real estate, which was subject to a balance of $8900 on a first mortgage, was taxed for $36,720.

With the exception of the evidence just mentioned, the unduly protracted testimony in the case is highly conflicting and frequently contradictory on material issues. The following occurrences took place in an attorney's office on January 16, 1939: Besides the attorney, those present were the plaintiff, his brother Archibald, and Thomas K. Fisher. The Muirhead brothers, as owners of all the shares of stock of the corporation, voted to sell their shares to Thomas K. Fisher in exchange for a mortgage of even date to them. After they had endorsed the shares in blank, Fisher, acting alone and as the then owner of all such shares, called a special meeting of the stockholders and elected himself president, treasurer and director, and Harry Fisher, his son, vice-president, secretary and director of the corporation. It was then voted to mortgage "the real property of the corporation by a mortgage deed of even date to James W Muirhead and Archibald B Muirhead." The record of this meeting is signed "Thomas K. Fisher Pres & Treas."

The corporation thereupon executed a note and mortgage

to the Muirheads individually in the sum of $14,806, which mortgage covered the real estate hereinbefore described and also assumed the payment of the balance of $8900 on the first mortgage. This second mortgage was signed "Muirhead Garage, Inc. By Thomas K. Fisher, Pres. & Treas.", and it was acknowledged by him in that capacity as the free act and deed of the corporation.

There is no evidence in the record before us that Harry Fisher, who did not testify, had any interest in the corporation. In other words, the evidence clearly shows that Thomas K. Fisher, Harry's father, was the real owner of all the shares of the corporation which the Muirheads had endorsed in blank. Hereinafter, unless otherwise indicated, the name Fisher will refer only to Thomas K. Fisher.

Having in mind some of defendant's exceptions, it is necessary to refer briefly to the testimony of the plaintiff and of Fisher respecting the negotiations that culminated in the above-mentioned transaction. Both of these parties agree that the stipulated price for the sale of all the shares of the corporation was $25,000, and that, after deducting therefrom the $8900 due on the first mortgage and certain outstanding bills of the corporation, the Muirheads were to receive $14,806. This sum is represented by the above-described mortgage to them from the corporation. No money passed in this transaction, which, according to the plaintiff, originated and was carried out by him in the ordinary course of dealing. Fisher, on the other hand, testified that he did not want either the corporation or its property but that he finally agreed to take them "as a favor" to the plaintiff, and also because he, Fisher, had endorsed some notes, in the sum of $500 or $600, for an oil burner that he had installed on those premises.

We will now resume our statement of the evidence with reference to the events that followed the transaction of January 16, 1939. The plaintiff testified that a few days thereafter he told Fisher that he had a chance to sell the property for $25,000 cash and that, if Fisher would "give

back the corporation" to him, he would give Fisher $1000. Fisher's answer to this request was: "No, nothing doing. This is a good proposition. I got a chance to make plenty of money here. Just sit tight." The person who was willing to buy the property was a witness for the plaintiff and Fisher did not deny the testimony that we have just mentioned.

Following such refusal, Fisher first converted the garage into a skating rink and, when this venture proved unprofitable, he decided to build a theatre on the premises. On June 9, 1939 he had the name of the corporation changed to Fairlawn Enterprise, Inc. Thereafter, the circumstances leading to and surrounding the transaction that occurred on September 30, 1939, in which the plaintiff, Fisher and one George W. Bradburn participated, are the subject of irreconcilable testimony. Bradburn could not be found by the plaintiff and Fisher disclaimed all knowledge of his whereabouts.

Two important facts, however, are firmly established by the evidence. First, on that day the Muirheads transferred their mortgage to Bradburn and received therefor, through Fisher, two checks in the total sum of $2200 from Bradburn, whom the plaintiff apparently never met. Second, on that same day Fisher gave to the plaintiff the following instrument, which raised the main issue in this case.

"Sept 30 - 1939

To James W. Muirhead,

Prov. R. I

I Thomas K. Fisher of City of Providence Do hereby agree to issue Forty shares non par value in the Fairlawn Enterprise Inc for the consideration of the transfer of mortgage and other considerations, *for Total Value of not less $12,000.00 Twelve Thou.* (italics ours)

Fairlawn Enterprise Inc<br>by Thomas K. Fisher Treas.

It is agreed that no stock will be sold only to stock holders of record.

Thomas Fisher"

The parties agree that this instrument, with the exception of the matter in italics, was written by the plaintiff in Fisher's presence. There is a serious dispute as to how and when the italicized matter, which is apparently in different ink from the rest of the instrument, was written therein. A fair understanding of the situation disclosed by the record on this point requires a review of the circumstances leading to the transfer of the Muirhead mortgage to Bradburn and to the execution of the above-quoted instrument.

Omitting many immaterial details and superfluous explanations, Fisher testified that the plaintiff asked him to find a purchaser for the mortgage; that when he, Fisher, first suggested the matter to Bradburn, whom he knew, the latter did not want the mortgage "at any price", but that after considerable urging by Fisher, Bradburn agreed to take it over for "around $2500". Fisher's testimony as to who delivered the mortgage and note to Bradburn and received from him the two checks hereinbefore mentioned for $2200 is marked by repeated failure of recollection. When the testimony of both parties on this point is fairly considered, the evidence is reasonably open to the conclusion that Fisher was the only person who dealt with Bradburn in this transaction.

Fisher emphatically denied that he sought or derived any personal benefit from the transfer of the mortgage to Bradburn or that such transfer was the consideration for his signing the agreement for shares, which is marked exhibit 26 in this case and will hereinafter be so referred to for convenience. His explanation of why he signed exhibit 26 is more clearly shown by quotations from his testimony. "Q. What were you giving him 40 shares of stock for if you didn't have any interest in the transfer? A. I didn't have no interest. How can I control a ten-dollar bill in your pocket if you want to sell it for two dollars? I had no control. He owned his note and mortgage. How could I control it? Q. What did you sign the agreement on that 40 shares for? A. Because he asked me for it. Q. Was it a gift? A. That's

right, it was just about a gift. Q. It says, doesn't it, for consideration of the transfer of the mortgage and other considerations? A. Yes. He wanted to see there was a consideration. I had no more to do with it than if you bought a mortgage in the Industrial Trust Company. I could not control it. . . . Q. And do you say that promise to give Mr. Muirhead shares of stock was just a gift? A. It was, sir. Q. It was not in consideration of the transfer of the mortgage to Bradburn? A. Not a bit."

Fisher further testified that the phrase "for Total. Value of not less than $12,000.00 Twelve Thou." was not in exhibit 26 when he signed it; that the insertion of that phrase was "an absolute fraud"; that he did not know in whose handwriting it was; that he was not "then" authorized by the corporation to sign that instrument, and that it was only at the plaintiff's suggestion that he "signed it that way". The substance of his whole contention respecting exhibit 26, as we gathered it with difficulty from his testimony, is that he was personally willing to give the plaintiff forty shares of his own stock if the skating rink or theatre venture was successful.

The plaintiff's testimony is quite different. He testified that during the summer of 1939 Fisher first complained that the mortgage was a hindrance to him in securing more money to develop the property, and finally asked the plaintiff to let him use the mortgage to obtain the necessary money to build a theatre, adding that unless this was done the mortgage would become worthless as he could carry on no longer and "we would all suffer then". After consulting his brother, the plaintiff finally acceded to Fisher's request and, on September 30, 1939, the latter brought to the plaintiff a typewritten transfer to George W. Bradburn of the mortgage. The consideration therein stated was the payment by Bradburn of $14,806, the face value of the mortgage.

Before transferring the mortgage, the plaintiff asked Fisher "What security would we get back to show our equity in the corporation, if we do that?" Fisher's answer, accord-

ing to the plaintiff, was to the effect that the corporation would be reorganized with an issue of only one hundred shares of new stock, forty shares of which were to go to the plaintiff, forty shares to Fisher, and twenty shares to Fisher's attorney. The plaintiff further testified that he wrote exhibit 26 in accordance with such understanding, and that the entire instrument, as it stands, was written by him in Fisher's presence.

Plaintiff's testimony respecting the fixing of the sum of not less than $12,000 as the value of the shares, which Fisher maintained was not in exhibit 26 when he signed it, is as follows: "When this was written out down as far as 'other considerations,' he signed that, and I had not yet signed the transfer of the mortgage note. And in reading that over I said, 'Well, I am only taking your word you will issue 100 shares of stock.' I said, 'Now, I will have approximately an equity of $12,000 in this mortgage note, if you bring back to me the $2500, and that should be inserted in there.' He said, 'That's all right with me, put anything you want in there.' That was put in there in his presence." Plaintiff admitted that the phrase italicized by us was apparently in different ink and explained that this probably was due to his inadvertently using a different pen when he wrote that phrase, as more than one pen was used in drawing up and signing exhibit 26.

It is clear from the evidence that on August 28, 1940 the defendant corporation leased the theatre, which was to be built or finished according to specifications in the lease, to the Fairlawn Theatre Company, Inc., an affiliate of the Standard Theatres, Inc. of Boston, Massachusetts, for twenty years from October 15, 1940, at a yearly rental set out in a separate agreement which was not put in evidence. Fisher testified that the rent was "about $9000 a year". The evidence is also clear that, in addition to the existing mortgages, the corporation, through Fisher, gave Bradburn two other mortgages covering the real estate herein described,

one for $7000 on October 28, 1941, and the other for $16,000 on February 27, 1942.

It further clearly appears in evidence that the corporation kept no permanent corporate records of any kind concerning its doings subsequent to January 16, 1939, when it executed the mortgage to the Muirheads. It kept no books of account, nor did it have a checking account or other form of deposit in any bank. Its dealings and finances were known only to Fisher, who acted for the corporation in all matters.

Fisher testified that he had repeatedly offered forty shares of his stock to the plaintiff but that, following the failure of the skating rink venture, the latter refused to accept those shares and insisted on getting the money. The plaintiff, on the other hand, testified that he kept after Fisher to issue the shares in accordance with his agreement, and that his answer on different occasions was: "Just keep your shirt on. In about another month or so I will have everything cleaned up"; or "Just keep quiet, we will have this thing under control very shortly"; or "Getting everything going along fine, and we will be sitting on easy street." No shares were ever received by or tendered to the plaintiff.

The meaning of exhibit 26 is of controlling force in this case. The plaintiff contends that this exhibit is a contract of the corporation wherein, as between the parties, the value of the forty shares of stock was definitely fixed by them at $12,000, which sum, in the event of default by the corporation, was the amount to be paid to the plaintiff as liquidated damages. The defendant, on the other hand, contends, first, that there was no contract in law; and, second, that if there was such a contract, it bound Fisher personally and not the corporation.

Under exception 17, which is to the denial of defendant's motion for a directed verdict, it urges that the construction of exhibit 26 was for the court, and that it should have directed a verdict for the defendant on any one of the following grounds: (1) lack of mutuality; (2) no consideration between the plaintiff and the defendant; (3) signature of

the corporation did not make it a party; (4) no authority in Fisher to bind the corporation; (5) contract was *ultra vires*; and (6) plaintiff's remedy was in equity and not in law.

It was mainly to meet these contentions and those that defendant makes under its exception to the denial of its motion for a new trial that we have outlined the evidence in some detail. The premise upon which the defendant proceeds in arguing the exception now under consideration, namely, that the court was bound to construe the contract, is unwarranted in the circumstances of this case. It is of course well established that where the terms of a contract are ascertained and unambiguous its construction and legal effect present a question of law for the court. But the case is otherwise if the terms of the contract are equivocal and susceptible of explanation by extrinsic evidence on a material point. In such a case, it is a question of fact for the jury, under proper instructions, to determine the meaning of the language employed.

In the instant case the situation which Fisher created was ambiguous and misleading. Whether he was fairly dealing in his own right as an individual, or whether he, as sole shareholder and manager of the corporation, was acting in its behalf and for its benefit was a question of fact for the jury to decide. There was evidence from which the jury could reasonably find that there was mutuality and consideration in the contractual relations between the plaintiff and the defendant corporation. This disposes of grounds (1) and (2).

Under grounds (3), (4) and (5) the defendant contends that the law of agency and the doctrine of corporate entity are sufficient to bar plaintiff's right to recover in this case. The situation confronting us, however, is one of identity more than of agency. Here there is such a unity of interest and ownership that the separate personalities of Fisher and the corporation no longer exist in reality. Adherence to the

principle of their separate existence would, under the circumstances, result in injustice.

But if recourse is had to the law of agency, there is evidence from Fisher himself that he owned all the shares of the corporation; that he had the authority to direct the corporation to issue other shares; and that, except as to exhibit 26, he alone acted for and in behalf of the corporation in all transactions herein mentioned. This and other pertinent evidence of Fisher, which plainly showed his complete ownership and control of the corporation, would justify a jury in finding not only that he held himself out to the plaintiff as having authority to act for the corporation, but also that he in fact had such authority when he executed exhibit 26. Grounds (3), (4) and (5) are without merit.

Under ground (6) defendant contends that plaintiff's remedy was in equity for the shares and not at law for damages. The answer to this contention depends upon the intention of the parties as disclosed by a fair reading of the whole of exhibit 26 in the light of the peculiar circumstances surrounding that transaction, which involved the transfer of shares in a one-man corporation. It is generally held that where a contract is not for the mere payment of money and there is no certain measure of the damages which would naturally result from a violation of the agreement in question, the parties may fix upon a sum in the nature of liquidated damages which shall be paid as compensation for breach of the agreement. 2 Pom. Eq. Juris. (5th ed.) §440. See *Cavanaugh* v. *Conway,* 36 R. I. 571, for a somewhat analogous situation in which this principle was applied. After due consideration of exhibit 26 and the surrounding circumstances, we are of the opinion that the parties stipulated, by clear implication if not in express terms, that if the defendant violated its agreement it would pay to the plaintiff at least $12,000, which sum was intended and fixed by them as in the nature of liquidated damages. We therefore find ground (6) without merit.

For the above-stated reasons we find no error in the denial

of defendant's motion for a directed verdict. Exception 17 is overruled.

Exception 32 is to the denial of defendant's motion for a new trial. In considering the conflicting and irreconcilable testimony of the parties in this case, the credibility of the plaintiff and of Fisher was of great importance, especially when their respective testimony was examined in the light of other evidence that was uncontradicted and unimpeached. The trial justice, in his rescript denying defendant's motion for a new trial, expressed himself in no uncertain terms as to his view of the case. Following a fair review of the evidence, he said that he saw a preconceived plan to use the corporate charter to defraud the plaintiff and to make any judgment which the plaintiff might obtain uncollectible. We cannot say that he was clearly wrong in this conclusion. Exception 32 is overruled.

Exceptions 1 to 16, inclusive, are to the granting of plaintiff's motion for a view and to the admission or exclusion of evidence. We have examined each of these exceptions and find them either frivolous or not prejudicial in character. These exceptions are all overruled.

Exceptions 18 to 31, inclusive, are to the charge. These exceptions relate to statements by the trial justice with reference to the identity of Fisher and the corporation; to Fisher's authority to enter into the contract; to the ratification of Fisher's acts by the corporation through Fisher; to the measure of damages; and to various other matters not of sufficient importance to specify. Under exceptions 18, 22 and 26 the defendant urges that the trial justice unduly stressed, to the prejudice of the defendant, certain evidence favorable to the plaintiff. What might seem undue repetition, when the statements complained of are disassociated from their context and joined together in succession, as the defendant does in its brief, vanishes when those statements are read in connection with their context as they appear in different parts of the charge. It is unnecessary to discuss any other of the above-mentioned exceptions. We have carefully

examined the charge as a whole and find that exceptions 18 to 31 are without merit. They are overruled.

All of the defendant's exceptions are overruled, and the case is remitted to the superior court for the entry of judgment on the verdict.

MOTION FOR REARGUMENT.

OCTOBER 30, 1946.

PER CURIAM. After our decision in the above case the defendant asked and received permission to file a motion for reargument. Pursuant to this permission it has filed such a motion, setting out therein certain reasons on which it bases its contention that justice requires a reargument of the case. We have carefully considered those reasons and we are of the opinion that they are without merit.

Motion denied.