Clifford McFARLAND, Read & Lundy, Inc.

v.

Michael BRIER, et al.

No. 99–374–Appeal.

Supreme Court of Rhode Island.

April 23, 2001.

John P. Gyorgy, Providence, for Plaintiff.

Lauren E. Jones, Joseph J. Reale, Jr., Joel K. Gerstenblatt, Providence, for Defendant.

Present WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

Goldberg, Justice.

This case came before the Supreme Court on February 5, 2001, on appeal from a Superior Court judgment in favor of the plaintiffs, Clifford McFarland and Read & Lundy, Inc. Although plaintiffs prevailed in the Superior Court, they now appeal the damage award made by a justice of the Superior Court after a trial without a jury.

### Facts and Travel

Read & Lundy, Inc. (R & L or plaintiff) is an industrial supply business that sells merchandise primarily to industrial concerns and manufacturing facilities. In 1978, after having been involved with the company for a number of years, Clifford McFarland (McFarland or plaintiff), became the owner. In the early 1980's, McFarland hired Dennis Bibeau (Bibeau) as a sales representative. Bibeau was in charge of his particular customer accounts and also had access to all customer information that R & L possessed. In 1990, McFarland and Bibeau entered into an agreement in which McFarland agreed to finance Bibeau's purchase of R & L and Bibeau was to pay him using the company's profits. In 1995, when the payments were no longer timely, McFarland and Bibeau amended the stock purchase agreement. Included in this amended agreement, signed by both McFarland and Bibeau in 1995, was a reciprocal non-compete provision. As the buyer, Bibeau agreed that in the event that a default should occur he would not

"(i) form, acquire or become associated in any capacity or to any extent with an enterprise competitive with the business of [R & L] with respect to the products sold by [R & L] to its clients, customers or accounts existing as of said termination date; or (ii) for the purpose of conducting or engaging in any busi-

ness which is competitive with the business of [R & L], call upon, solicit, advise or otherwise do, or attempt to do, business with any clients, customers or accounts of [R & L] with respect to the products sold by [R & L] to its clients, customers or accounts existing as of said termination date."

McFarland entered into the same covenant that, as seller, in the event that the sale was completed, he also would refrain from such competitive endeavors. Under the agreement, Bibeau agreed to pay McFarland the sum of $1.6 million. McFarland testified at trial that Bibeau also agreed to make a down payment of $700,000 to purchase the stock by August 31, 1995. When that payment was not made, McFarland, pursuant to the agreement, repossessed the stock and removed Bibeau as president of the company. Bibeau then resigned.

It was during Bibeau's tenure as president that Michael Brier (Brier or defendant) became involved with R & L. Brier's accounting firm, Brier and Company (Brier and Company or the corporate defendant), was retained by R & L to assist in the financing of the buyout by Bibeau.[1] Accordingly, Brier, as an employee of Brier and Company, had access to all the company's records, including all financial records, customer lists, customer billing histories and supplier information. After Bibeau left R & L, he and Brier formed another corporation, Consigned Systems, Inc. (CSI), and directly engaged in head-to-head competition with R & L. To finance this new entity Brier, through Brier and Company, made a significant capital investment in CSI.[2]

In the weeks that followed Bibeau's departure from R & L, McFarland was informed by his customers that CSI was soliciting their business by submitting bids for the same products sold by R & L. Not only were Brier and Bibeau targeting R & L's customers, they also were trying to recruit R & L sales representatives. A witness described a meeting attended by both Brier and Bibeau, who were attempting to lure a long-time R & L sales representative away from R & L to work for CSI. The witness was warned that if she ever was questioned about the meeting, that Bibeau was in fact "not present" at the meeting. It was explained to her that because of a noncompetition agreement that he signed with R & L, Bibeau could not own or be associated with a company that competed with R & L. Bibeau then assured the witness that he possessed all of R & L's computer programs, as well as the customer information necessary to compete with R & L.

In the fall of 1995, Bibeau filed an action in United States District Court for the District of Rhode Island seeking relief from the noncompetition agreement. R & L counter-sued seeking to enforce the agreement. R & L prevailed. The District Court judge found that the non-compete clause as between McFarland and Bibeau was valid, and further, that Bibeau had misappropriated and used the computer program relative to R & L's customer base. The trial judge issued a three-year injunction prohibiting Bibeau from com-

---

1. Brier and Company, also a defendant in this case, is a corporation, consisting of Brier as the only accountant and staffed by one secretary. Prior to oral argument in this case, Michael Brier filed a petition for bankruptcy. Brier has waived the ninety-day automatic stay for purposes of this appeal.

2. During oral argument reference was made to a $100,000 loan or investment from Michael Brier, through Brier and Company to CSI. The record, however, reflects payments of $50,000 to CSI from Brier and Company.

peting with R & L with respect to any customers who were R & L's clients at the time of Bibeau's departure. Bibeau also was permanently enjoined from using any information he had purloined from R & L in violation of the Trade Secrets Act, G.L. 1956 chapter 41 of title 6.

On March 1, 1996, McFarland and R & L filed suit in Superior Court against Michael Brier and CSI, alleging tortious interference with contractual relationships, misappropriation of trade secrets, breach of professional duty through the illegal disclosure of confidential information, interference with a prospective business advantage and trade disparagement.[3] On May 9, 1996, a preliminary injunction issued enjoining and restraining both Brier and CSI from soliciting or marketing, directly or indirectly any products or services to any customers of R & L. At the time the restraining order was entered, R & L had been operating with a 30 percent price markup on its products. McFarland testified that when he became aware that Brier and Bibeau, through CSI, were in head-to-head competition with R & L, he lowered R & L's markup from 35 percent to 30 percent in an effort to retain his customer base.

The trial justice made a decision for the plaintiff on four of the five counts in the complaint,[4] and found that CSI had misappropriated trade secrets from R & L, that Brier was guilty of tortious interference with the contractual relationship between McFarland and Bibeau, to wit: the non-compete clause, that Brier and CSI had interfered with the prospective business advantage of R & L, and that Brier disclosed confidential business information belonging to his former client, in violation

of his fiduciary duty. The trial justice noted, however, that there was no evidence in the record that the corporate defendant had disclosed any confidential information to CSI. The trial justice awarded plaintiffs damages of $67,936, with Brier and CSI joint and severally liable. The plaintiffs' claims for both punitive damages and compensation for the diminution in the value of R & L stock were denied by the trial justice on the grounds that defendants' conduct did not rise to the egregious level required for the award of punitive damages and that plaintiffs had a duty to mitigate their damages and failed to do so. The plaintiffs have appealed.

## Discussion

The plaintiffs have set forth several issues on appeal. First, they argued that the trial justice erred in finding that in order to mitigate its damages, R & L was required to raise its prices after the temporary restraining order was issued barring defendants from further encroachment upon R & L's customer base. Second, plaintiffs asserted that Brier and Company was wrongly excused from paying damages based on the finding that the corporate defendant was not liable under the Trade Secrets Act. Third, plaintiffs contended that the trial justice erred in applying Rhode Island's common law standard for an award of punitive damages rather than determining whether there was a "willful and malicious" misappropriation of confidential trade secret information; thereby giving rise to an award of exemplary damages and attorneys fees pursuant to the Trade Secrets Act. Finally, plaintiffs argued that the trial justice applied the wrong legal

---

**3.** The first four counts were pleaded in the original complaint; the fifth count was added in an amended complaint filed on April 15, 1996.

**4.** The fifth count, trade disparagement, was dismissed by the trial justice as a matter of law; plaintiffs have not appealed that portion of the ruling.

standard in declining to award punitive damages against the defendants.

The law in Rhode Island is well settled with respect to findings of fact made by a trial justice sitting without a jury. Our standard of review in the instance of a nonjury trial is very deferential. *Barone v. Cotroneo*, 711 A.2d 648, 649 (R.I.1998) (mem.). "[U]nless such findings are clearly erroneous or unless the trial justice misconceived or overlooked material evidence or unless the decision fails to do substantial justice between the parties," such findings will not be disturbed on appeal. *Paradis v. Heritage Loan and Investment Co.*, 701 A.2d 812, 813 (R.I.1997) (quoting *Harris v. Town of Lincoln*, 668 A.2d 321, 326 (R.I. 1995)).

### Mitigation of Damages and Diminution of Value of Stock

The first issue raised by the plaintiffs concerns the question of mitigation of damages. The plaintiffs advanced the argument that the trial justice erred when she reduced the compensatory damages in this case from $151,380 to $67,936 on the ground that plaintiffs, by continuing a price markup of only 30 percent failed to mitigate damages rather than reinstating the original 35 percent, after the court had temporarily enjoined defendants from competing with them. Additionally, plaintiffs argued that the burden of proof was on the defendants, not plaintiffs, to show that R & L's customers would have remained loyal to R & L regardless of a price increase to 35 percent over cost.

The affirmative defense of mitigation of damages is often referred to as the "doctrine of avoidable consequences." *Tomaino v. Concord Oil of Newport, Inc.*, 709 A.2d 1016, 1026 (R.I.1998). The law in Rhode Island is well settled that a party claiming injury "has a duty to exercise reasonable diligence and ordinary care in attempting to minimize its damages." *Id.* (citing *Bibby's Refrigeration, Heating & Air Conditioning, Inc. v. Salisbury*, 603 A.2d 726, 729 (R.I.1992)). The law requires reasonable efforts and ordinary care under the circumstances, not "Herculean exertion." *Tomaino*, 709 A.2d at 1026. When mitigation of damages is at issue the defendant has the burden of proving by affirmative evidence, that the plaintiff failed to adequately mitigate his or her damages. *Bibby's Refrigeration*, 603 A.2d at 729 (citing *Norm Co. v. Cumberland Coal Co.*, 53 R.I. 228, 229, 165 A. 592, 593 (1933)).

Upon a careful review of the record, it is clear that plaintiffs did in fact mitigate their damages. Under the circumstances in this case, in an act of self preservation, plaintiffs mitigated their damages by reducing the markup in the first instance rather than increasing it. The testimony established that if R & L had in fact raised the markup to between 35 and 40 percent, it faced the very real risk of losing its customers to other competitors. In formulating her decision, the trial justice overlooked this material evidence. She reasoned that once the temporary restraining order was in effect, plaintiffs had a duty to raise the markup an additional six to eight percent to mitigate any additional damages plaintiffs may have suffered. However, the defendants introduced no evidence that tended to show that R & L would have retained its customer base had it reinstated its original markup once the restraining order was issued. The defendants had the burden of establishing that plaintiffs' customers would not defect if the prices were raised. R & L's customers were present throughout the trial and were never asked whether they would have remained loyal customers to R & L in the face of a price increase

or whether they would have engaged another supplier. Thus, we conclude that the trial justice erred in reducing the damages available to plaintiffs based on plaintiffs failure to mitigate damages. We are not willing, however, to hold that there is no duty to mitigate damages in an intentional tort situation; however, the extent of the mitigation should include an evaluation of the nature of the harm suffered by the plaintiffs. Accordingly, we reverse that portion of the trial justice's decision awarding compensatory damages in the amount of $67,936 and reinstate the original amount of $151,380, found by the trial justice to represent the actual amount of R & L's losses as the result of defendants' misconduct.

In light of our decision rejecting the defense of mitigation of damages, we also must address the denial of damages for the diminution in value of R & L stock. The trial justice found that the figures used to determine the value of the stock were "seriously flawed because they [did] not account for the plaintiff's own failure to mitigate" and went on to deny damages based on the fact that plaintiffs failed to establish the loss in value to the stock with any reasonable degree of certainty. Because we have determined that plaintiffs did mitigate their damages, we reverse the decision with respect to the diminution in the value of stock and remand this issue to the Superior Court for an accurate calculation of the actual diminution in the value of plaintiffs' stock.

### Punitive Damages and Attorneys Fees

■ Next, plaintiffs contended that the trial justice erred in applying our common law standard for the imposition of punitive damages, conduct amounting to criminali-

ty, rather than determining whether defendants had engaged in "willful and malicious" misappropriation of trade secrets, a finding that would allow for exemplary damages and attorneys fees for a violation of the Trade Secrets Act.[5] The trial justice, citing *Palmisano v. Toth,* 624 A.2d 314, 318 (R.I.1993), stated that the standard for imposing punitive damages is "rigorous and will be satisfied only in instances wherein the defendants' conduct requires deterrence and punishment over and above that provided in an award of compensatory damages." She went on to explain that although the defendants' conduct was reprehensible, it did not rise to the level of the egregious conduct required for an award of punitive damages, and concluded that the amount of compensatory damages was sufficient punishment for defendants' behavior. Although the trial justice correctly referenced the common law rule, we are satisfied that in the case of a violation of the Trade Secrets Act, punitive damages are available for conduct that is willful and malicious and need not rise to the level of criminality.

■ This Court has held that punitive damages are significantly restricted under Rhode Island law. *Johnson v. Johnson,* 654 A.2d 1212, 1217 (R.I.1995) (citing *Palmisano,* 624 A.2d at 314). In such a case, the party seeking punitive damages has the "burden of producing 'evidence of such willfulness, recklessness or wickedness, on the part of the party at fault, as amount[s] to criminality, which for the good of society and warning to the individual, ought to be punished.'" *Id.* at 1217 (citing *Palmisano,* 624 A.2d at 318). In the instant case, however, we are dealing with a violation of the Uniform Trade Secrets Act, which expressly provides for exemplary

5. Exemplary damages are defined in Black's Law Dictionary as "[d]amages other than compensatory damages which may be award-

ed against [a] person to punish him for outrageous conduct." Black's Law Dictionary 390 (6th ed.1990).

damages for willful and malicious appropriation.[6] The standard to be used for awarding punitive damages is set forth in § 6–41–3(b) and does not require a showing of misconduct amounting to criminality. Upon a careful review of § 6–41–3, it is clear that the Legislature intended to relax this stringent common law standard to deal with the intentional and egregious misconduct found in this case. Although punitive damages are usually left to the discretion of the finder of fact, *Scully v. Matarese*, 422 A.2d 740, 741 (R.I.1980), in this instance the denial of punitive damages constituted an error in law. The Legislature was clear when it stated that "[i]f *willful and malicious misappropriation* exists, the court may award exemplary damages in an amount not exceeding twice an award made under subsection (a)." Section 6–41–3(b). (Emphasis added.)

▉▉▉ Under the facts of this case, we are satisfied that if ever egregious misconduct deserving of punitive damages has occurred, this is such a case. Indeed, the conduct in this case cries out for punishment. Michael Brier was a licensed accountant who, through Brier and Company, used a client's confidential information obtained within the context of a fiduciary relationship, to profit himself and at the same time harm his client.[7] The trial justice found that Brier had disclosed trade secrets to CSI. Knowing that what he was doing was wrong, Brier also lied to potential employees by urging them to lie about Bibeau's presence at meetings in direct violation of Bibeau's noncompetition agreement with R & L. Brier's actions were by definition willful and malicious, such that a failure to award punitive damages under the facts would amount to an abuse of discretion. Thus, we reverse the trial justice's finding that compensatory damages were sufficient punishment for defendant's behavior and, as contemplated by § 6–41–3(b), direct that an award of punitive damages enter in the amount of twice the total award for compensatory damages.

Lastly, an award of attorneys fees is specifically provided in § 6–41–4.[8] As

---

6. General Laws 1956 § 6–41–3 provides:

   "**Damages.**—(a) Except to the extent that a material and prejudicial change of position prior to acquiring knowledge or reason to know of misappropriation renders a monetary recovery inequitable, a complainant is entitled to recover damages for misappropriation. Damages can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss. In lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret.

   (b) If willful and malicious misappropriation exists, the court may award *exemplary damages* in an amount not exceeding twice an award made under subsection (a)." (Emphasis added.)

7. In a consent order entered into between Michael Brier and the Rhode Island Board of Accountancy, Brier, referred to as "Respondent," made the following admissions:

   "13. Respondent used and disclosed confidential information obtained during the course of his engagement by Read & Lundy in connection with the formation and operation of CSI, including customer identities and preferences, costs, pricing, suppliers, sales projections, and capital requirements. * * *

   "15. Respondent's use and disclosure of Read & Lundy's confidential information violates R.I.G.L. §§ 5–3.1–23 and 5–3.1–12(3), (4), (10) and (11) and is contrary to Respondent's ethical obligations under the Code of Professional Conduct * * *."

8. Section 6–41–4 provides:

   "**Attorneys Fees.**—If, (a) a claim of misappropriation is made in bad faith, or (b) a motion to terminate an injunction is made

stated above, it is clear that willful and malicious misappropriation of important trade secrets occurred in this case. Refusal to award attorneys fees for such willful and deliberate misconduct would result in far less than full compensation for plaintiffs' injuries, because attorneys fees are restitutionary in nature and are designed to make a party whole. Therefore, we remand this case to the Superior Court for a calculation of the amount of attorneys fees to be awarded to plaintiffs in accordance with this decision.

### Corporate Liability

▮ We shall next address plaintiffs' contention that the trial justice erred in finding that Brier and Company was not liable under the Trade Secrets Act, thereby permitting the corporate defendant to avoid the payment of damages. In her decision, the trial justice found that there was "compelling circumstantial evidence that CSI misappropriated R & L's trade secret information with regard to it's cost and pricing * * *." She further found that Brier disclosed confidential information belonging to his former client, R & L, in violation of G.L.1956 § 5–3.1–23(a).[9] However, the trial justice also found that there was no evidence in the record to establish that Brier and Company actually disclosed any confidential information to CSI. Specifically she stated "plaintiff's have failed to present any compelling evidence to justify piercing the corporate veil," thus holding only Brier liable under the Trade Secrets Act and refusing to impute liability to his alter ego, Brier and Company. We respectfully disagree.

▮ The law in Rhode Island is well settled that to impose liability on a corporation for the acts of its employees, the facts of a particular case must "render it unjust and inequitable to consider the subject corporation a separate entity," such as "when the corporate entity 'is used to defeat public convenience, justify wrong, protect fraud, or defend crime * * *.' " *R & B Electric Co. v. Amco Construction Co.*, 471 A.2d 1351, 1354 (R.I.1984) (quoting *Vennerbeck & Clase Co. v. Juergens Jewelry Co.*, 53 R.I. 135, 139, 164 A. 509, 510–11 (1933)). When, as here, "there is such a unity of interest and ownership" that the separate personalities of the individual and the corporation no longer exist in reality, "[a]dherence to the principle of their separate existence would, under the circumstances, result in injustice." *Id.* at 1354 (quoting *Muirhead v. Fairlawn Enterprise, Inc.*, 72 R.I. 163, 172–73, 48 A.2d 414, 419 (1946)); *see also Doe v. Gelineau*, 732 A.2d 43 (R.I.1999) (proof was insufficient to establish that defendant substantially participated in, much less controlled, the finances, operations and management of the corporation to the extent that the latter's separate corporate identity should be disregarded and liability imposed).

In the case at bar, the trial justice misconceived the role that Brier and Company played in this situation. The corporate defendant was wholly owned by Michael Brier and, significantly, it was Brier and

or resisted in bad faith, or (c) willful and malicious misappropriation exists, the court may award reasonable attorney's fees to the prevailing party."

9. General Laws 1956 § 5–3.1–23 provides in pertinent part:

   "**Confidential Communications.**—(a) No licensee or any employee of a licensee, including, but not limited to, clerks, parapro-

fessionals, and students under work-study programs on a paid or pro bono basis, shall disclose any confidential information obtained in the course of a professional engagement except with the written consent of the client or former client, or as a disclosure of confidential information is permitted by subsection (c) or (d) of § 5–3.1–18 in connection with peer reviews or board investigations."

Company that was retained by R & L. The initial contact between these parties involved Brier and Company performing accounting duties for R & L. Further, Michael Brier was the only accountant employed by Brier and Company, the only other employee of the company was his secretary. Brier became privy to confidential information about R & L's business practices through the relationship between the corporate defendant and R & L. Brier then went on to form CSI, a company that competed directly with R & L, having obtained, through his employment at Brier and Company, R & L's customer list and business information. Clearly, Michael Brier was Brier and Company. Further, Brier made a significant capital loan/investment in CSI with funds from Brier and Company. The evidence that linked Brier and Company to Brier's conduct, resulting in the harm to its former client, R & L, is overwhelming and was overlooked by the trial justice. Further, the finding that there was no evidence to support the claim that Brier and Company disclosed any confidential information to CSI was error and fails to do substantial justice between the parties. The finding that Brier disclosed confidential information to CSI and that he made a significant capital loan/investment into the business with funds drawn from Brier and Company is conduct that is so closely intertwined with the corporate defendant that it is impossible to separate the individual from the corporation for purposes of imposing liability. For these reasons, we conclude that Michael Brier, Brier and Company and CSI were coventures acting together in a joint enterprise as alter egos. Therefore, Brier and Company is jointly and severally liable for the damages awarded to R & L.

## Conclusion

For the aforementioned reasons, we vacate the trial justice's award of compensatory damages in the amount of $67,936 and direct the award of $151,380, the actual amount of plaintiffs' damages as found by the trial justice. Further, having determined that defendants did not prove that plaintiffs failed to mitigate their damages, we remand to the Superior Court for an award of damages for the diminution in value of R & L stock to be determined in accordance with this decision. With respect to punitive damages, we vacate that portion of the judgment denying plaintiffs punitive damages and remand with directions to enter an award of punitive damages against all defendants in an amount equaling twice the award for compensatory damages. We also remand for an award of attorneys fees. Finally, we reverse the trial justice's decision with respect to the corporate liability of Brier and Company and deem Brier and Company to be jointly and severally liable for all damages.

Accordingly, the appeal is sustained, the judgment is vacated and the case is remanded to the Superior Court in accordance with our decision.

Chief Justice WILLIAMS did not participate.