In re Michael BRIER, Debtor.

Read & Lundy, Inc. and Cliff McFarland, Plaintiffs,

v.

Michael Brier, Defendant.

Bankruptcy No. 01–10668–JNF.
Adversary No. 01–1173.

United States Bankruptcy Court,
D. Massachusetts.

Feb. 26, 2002.

John P. Gyorgy, Boisseau Dean & Gyorgy LLP, Providence, RI, for Plaintiff.

Gary W. Cruickshank, Boston, MA, for Defendant.

## MEMORANDUM

JOAN N. FEENEY, Bankruptcy Judge.

### I. INTRODUCTION

The matter before the Court is the Motion for Summary Judgment filed by the Plaintiffs, Read & Lundy ("R & L") and Cliff McFarland ("McFarland")(collectively the "Plaintiffs"). The Defendant, Michael Brier ("Brier" or the "Debtor"), filed an Opposition to the Motion. The Court heard the Motion and the Opposition on January 9, 2002. The principal issue presented is whether the Debtor's obligation to the Plaintiffs, which was the subject of a state court judgment, is nondischargeable under 11 U.S.C. § 523(a)(6) because he is collaterally estopped from relitigating whether he willfully and maliciously injured the Plaintiffs or their property by violating the Uniform Trade Secrets Act as enacted in Rhode Island. *See* R.I. Gen. Laws §§ 6–41–1—41–9 (1956).

### II. FACTS

The Plaintiffs, in accordance with MLBR 7056–1 and District Court Local Rule 56.1, submitted a "Statement of Material Facts Not in Dispute." The Debtor filed an Objection addressing the facts set forth by the Plaintiffs in their Statement.

On January 30, 2001, the Debtor filed a voluntary Chapter 7 petition. It was the Debtor's second bankruptcy petition, as he had filed previously a Chapter 11 petition, which this Court dismissed. On February 1, 2001, the Plaintiffs moved for relief from the automatic stay to proceed with their appeal to the Supreme Court of Rhode Island from a judgment entered by the Rhode Island Superior Court. Although the Debtor had objected to a similar motion in his Chapter 11 case, he did not object to the Plaintiffs' motion in the Chapter 7 case, and the Court granted the motion for cause. *See* 11 U.S.C. § 362(d)(1).

On April 23, 2001, the Rhode Island Supreme Court issued its decision, vacating the Superior Court's judgment and remanding the case to the Superior Court for entry of judgment in accordance with its decision. On September 17, 2001, the Superior Court entered a final judgment with respect to the Plaintiffs' five count amended complaint and the Debtor's counterclaims. In addition, on March 2, 1999, the Debtor executed a "Consent Order"

with the Rhode Island Board of Accountancy in which he made material admissions that he used and disclosed confidential information of R & L in violation of R.I. Gen Laws. §§ 5–3.1–23 and 5–3.1–12(3), (4), (10) and (11) and his ethical obligations under the Code of Professional Conduct governing accountants.

## A. *The Superior Court Decision*

In mid–1998, the Superior Court issued a 23 page decision following a non-jury trial in May and June of 1997. The Court entered judgment in favor of the Plaintiffs on four of five tort claims against the defendants, who were the Debtor, his accounting firm, Michael Brier & Company ("Brier & Co."), and Consigned Systems, Inc. ("CSI"). The tort claims were: 1) Misappropriation of Trade Secrets, asserted against the Debtor, Brier & Co. and CSI; 2) Tortious Interference with Contractual Relations, asserted against the Debtor and CSI; 3) Interference with Prospective Business Advantage, asserted against the Debtor and CSI; 4) Breach of Professional Duty, asserted against the Debtor and Brier & Co.; and 5) Trade Disparagement, asserted against the Debtor and CSI. The Superior Court dismissed the trade disparagement count and the counterclaims asserted by the Debtor, Brier & Co. and CSI as a matter of law. The Superior Court made detailed findings of fact, as summarized below.

R & L is a supplier of industrial products to industrial concerns, manufacturing facilities and the boat building industry. It uses a consigned inventory system, thereby relieving customers of the burden of carrying their own inventory and employing personnel to oversee and manage inventory.

In 1990, McFarland, R & L's sole shareholder, entered into a Stock Purchase Agreement with Dennis Bibeau ("Bibeau") pursuant to which Bibeau agreed to purchase McFarland's stock in R & L and both parties agreed not to compete with R & L for a term of three years after termination of employment with the company. McFarland declared a default under the 1990 agreement in early 1995. Thereafter, McFarland and Bibeau entered into an Amended and Restated Stock Purchase Agreement, which also contained a three-year non-competition agreement.

Prior to the execution of the 1995 agreement, Bibeau contacted the Debtor to assist him in securing a loan to buy McFarland's stock. The Debtor, who had formed the accounting firm of Brier & Co. in 1993, acted as an accountant for R & L which paid him pursuant to bills he rendered. Additionally, Brier prepared a business plan for R & L which was submitted to First Bank and Trust. The Debtor, as R & L's accountant, had access to its records, "including financial records, customer lists, supplier information and customers' billing histories." *McFarland v. Brier*, C.A. No. 96–1007, Slip op. at 3, 2001 WL 1097779 (R.I.Super.1998).

Bibeau failed to make the initial payment under his 1995 agreement with McFarland, and McFarland declared a default and resumed control of R & L. Bibeau terminated his employment with R & L on September 15, 1995 and immediately contacted the Debtor. On September 21, 1995, the Debtor and Bibeau met with William and Susan Day for the purpose of inducing William Day to work for CSI, a company that the Debtor caused to be incorporated the very next day. Susan Day testified that the Debtor told the Days that " 'Mr. Bibeau is not here' at the meeting because it would be a breach of his covenant not to compete." *Id.* at 4. Additionally, Bibeau assured the Days that he had all the computer programs and

other customer information from R & L necessary to compete with R & L. *See id.*

In incorporating CSI, Brier identified himself as the stockholder and director. He "hired" Bibeau as a special consultant. CSI proceeded to solicit R & L customers, causing R & L's profit margins to deteriorate from 40% to 30%. To obtain financing for CSI, the Debtor submitted a business plan to First Bank and Trust in which Bibeau was identified as "Vice President in charge of marketing." *Id.* In the business plan, the Debtor recognized the existence of the non-competition agreement between Bibeau and R & L and indicated that Bibeau would be filing a lawsuit to resolve the issue.[1] In the ensuing lawsuit among Bibeau, McFarland and R & L, McFarland and R & L prevailed. Additionally, the federal district court judge hearing the civil action determined that "Bibeau had appropriated and used the R & L computer program with all the information about R & L's customers in violation of the RI Trade Secrets Act." Slip op. at 5.

The Superior Court found that the Debtor and CSI misappropriated R & L's trade secrets, rejecting their arguments to the contrary as disingenuous. In discussing her determination that the Debtor and CSI tortiously interfered with contractual relations, the Superior Court stated:

> It strains credibility to believe that Bibeau would have brought his idea and expertise to Brier in return for no part of the corporation. It is clear from the evidence that Brier went to great trouble to give the appearance that Bibeau

was uninvolved in the formation and running of CSI despite the fact that Bibeau was actively involved in CSI's operations. Such conduct demonstrates that Brier was fully aware of the non-compete agreement and demonstrates that despite this awareness he, nevertheless, completely disregarded and intentionally interfered with the agreement.

Slip op. at pp. 11–12.

With respect to the Plaintiffs' claims that the Debtor intentionally interfered with prospective business advantage, the Superior Court observed that the elements for that tort were identical to those for the tort of interference with contractual relations, except that the latter tort requires that an actual contract exist. Additionally, the court stated the applicable burden of proof: "the plaintiff must prove that the defendant acted with legal malice, that is the intent to do harm without justification." Slip op. at 13. The Superior Court found that the Debtor was liable for the tort of intentional interference with prospective business advantage, emphasizing that Brier misappropriated trade secrets and confidential information from R & L and proffered no persuasive justification for his actions. *See* Slip op. at 14. The Superior Court also determined that the Debtor disclosed confidential information that belonged to R & L to CSI, finding violations of R.I. Gen Laws § 5–3.1–23(a). The court noted that in the business plan he prepared the Debtor stated " '[a]ll financial information is based on former

---

1. In the business plan, the Debtor stated "Consigned System, Inc. [sic] was formulated from a dispute arising between the principals of Read & Lundy, Inc.. [sic] This dispute lead to the realization that a new corporation could be formed with encompassed [sic] the strengths of the predecessor and actentuate [sic] on these positives to eventually surpass Read." Exhibit B to Complaint, Business

Plan, p. 5. The Debtor also stated in the business plan the following: "Our major competitor will be Read & Lundy, Inc.. [sic] Their [sic] strength is that our top salesman, Dennis Bibeau built the company up to its current positions. [sic]. However with his departure and a number of other employees to CSI, Read's ultimate ability to service their [sic] clients is seriously questioned." *Id.* p. 8.

projections calculated for a competitor who was approved for an S.B.A. loan.'" Slip op. at 17.

The Plaintiffs sought exemplary and punitive damages in the Superior Court. The court, relying upon the common law and citing *Palmisano v. Toth*, 624 A.2d 314, 318 (R.I.1993), declined to award such damages, stating "this Court does not find that it [the defendants' conduct] rises to the egregious level required for an award of punitive damages...." Slip op. at p. 21.

### B. *The Rhode Island Supreme Court Decision*

The Plaintiffs appealed, complaining of the inadequacy of the damages awarded by the Superior Court. The Rhode Island Supreme Court noted, in particular, that the Plaintiffs contended that "the trial justice erred in applying Rhode Island's common law standard for an award of punitive damages rather than determining whether there was a 'willful and malicious' misappropriation of confidential trade secret information; thereby giving rise to an award of exemplary damages and attorneys fees pursuant to the Trade Secrets Act." *McFarland v. Brier*, 769 A.2d 605, 609 (R.I.2001). In reversing the trial judge, the Supreme Court stated the following:

> Although the trial justice correctly referenced the common law rule, we are satisfied that in the case of a violation of the Trade Secrets Act, punitive damages are available for conduct that is willful and malicious and need not rise to the level of criminality.

> This Court has held that punitive damages are significantly restricted under Rhode Island law. In such a case, the party seeking punitive damages has the "burden of producing 'evidence of such willfulness, recklessness or wickedness, on the part of the party at fault, as amount[s] to criminality, which for the good of society and warning to the individual, ought to be punished.'" In the instant case, however, we are dealing with a violation of the Uniform Trade Secrets Act, which expressly provides for exemplary damages for willful and malicious appropriation. The standard to be used for awarding punitive damages is set forth in § 6–41–3(b) and does not require a showing of misconduct amounting to criminality. Upon a careful review of § 6–41–3, it is clear that the Legislature intended to relax this stringent common law standard to deal with the intentional and egregious misconduct found in this case. Although punitive damages are usually left to the discretion of the finder of fact in this instance the denial of punitive damages constituted an error in law. The Legislature was clear when it stated that "[i]f *willful and malicious misappropriation* exists, the court may award exemplary damages in an amount not exceeding twice an award made under subsection (a)." Section 6–41–3(b).

Under the facts of this case, we are satisfied that if ever egregious misconduct deserving of punitive damages has occurred, this is such a case. Indeed, the conduct in this case cries out for punishment. Michael Brier was a licensed accountant who, through Brier and Company, used a client's confidential information obtained within the context of a fiduciary relationship, to profit himself and at the same time harm his client. The trial justice found that Brier had disclosed trade secrets to CSI. Knowing that what he was doing was wrong, Brier also lied to potential employees by urging them to lie about Bibeau's presence at meetings in direct violation of Bibeau's noncompetition agreement with R & L. Brier's actions were by definition willful and malicious, such that a failure to award punitive

damages under the facts would amount to an abuse of discretion. Thus, we reverse the trial justice's finding that compensatory damages were sufficient punishment for defendant's behavior and, as contemplated by § 6–41–3(b), direct that an award of punitive damages enter in the amount of twice the total award for compensatory damages.

769 A.2d at 611–12 (citations omitted, footnotes omitted, emphasis in original). The Supreme Court also ordered an award of attorneys' fees.

In accordance with the directions of the Rhode Island Supreme Court, the Superior Court entered judgment on September 17, 2001 as follows:

Read & Lundy, Inc. is awarded damages and judgment shall enter against each of the defendants for $151,380 in compensatory damages, $302,760 in exemplary damages pursuant to R.I.G.L. § 6–41–3, costs in the amount of $5,847.48, for a total of $459,958.48, plus prejudgment interest on the amount of $151,380 from September 28, 1995 through the date of this judgment.

Further, under Count 8 of the Amended Complaint, Read & Lundy, Inc. is awarded attorneys fees pursuant to R.I.G.L. § 6–41–4 in the amount of $401,090, for which each of the defendants is jointly and severally liable.

Clifford McFarland is awarded damages and judgment shall enter against each of the defendants in the amount of $327,600, plus pre judgment interest on that amount from September 28, 1995 through the date of this judgment.

## III. SUMMARY JUDGMENT STANDARD

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); Fed. R. Bankr.P. 7056.

A material fact is one which has the "potential to affect the outcome of the suit under the applicable law." Thus, the nonmovant bears the burden of placing at least one material fact into dispute once the moving party offers evidence of the absence of a genuine issue. In other words, neither "conclusory allegations, improbable inferences, and unsupported speculation," nor "[b]rash conjecture coupled with earnest hope that something concrete will materialize, is [ ] sufficient to block summary judgment."

*Crawford v. Lamantia,* 34 F.3d 28, 31 (1st Cir.1994) (citations omitted).

## IV. DISCUSSION

 It is well-established that the doctrine of collateral estoppel applies in nondischargeability proceedings in bankruptcy cases and bars relitigation of issues already fully litigated and decided by another court. *See Grogan v. Garner,* 498 U.S. 279, 285 n. 11, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *Piccicuto v. Dwyer,* 39 F.3d 37, 39–41 (1st Cir.1994). Where the issue was litigated under state law, the law of the state that issued the judgment, in this case Rhode Island law, determines the preclusive effect of the state court judgment. *See Rally Hill Productions, Inc. v. Bursack (In re Bursack),* 65 F.3d 51, 53 (6th Cir.1995); *Stowe v. Bologna (In re Bologna),* 206 B.R. 628, 630–31 (Bankr. D.Mass.1997).

 Under Rhode Island law, " 'an issue of ultimate fact that has been actually litigated and determined cannot be relitigated between the same parties or their privies in future proceedings.' " *George v.*

*Fadiani,* 772 A.2d 1065, 1067 (R.I.2001)(quoting *Casco Indemnity Co. v. O'Connor,* 755 A.2d 779, 782 (R.I.2000)). "In order for collateral estoppel to apply, three factors must be present: there must be an identity of issues; the prior proceedings must have resulted in a final judgment on the merits; and the party against whom collateral estoppel is sought must be the same as or in privity with the party in the prior proceeding." *Fadiani,* 772 A.2d at 1067–68 (quoting *Casco,* 755 A.2d at 782). An issue may be actually decided for purposes of collateral estoppel, even if it is not explicitly decided, if it "constituted, logically or practically, a necessary component of the decision reached in the prior litigation." *Stoehr v. Mohamed,* 244 F.3d 206, 208 (1st Cir.2001)(quoting *Grella v. Salem Five Cent Savings Bank,* 42 F.3d 26, 30–31(1st Cir.1994)).

 In the present case, the Debtor had a full and fair opportunity to litigate the tort claims brought against him by the plaintiffs in the Rhode Island Superior Court. The only issue relating to collateral estoppel is whether there is an identity of issues between those decided by the Rhode Island courts and those pertinent to a determination of nondischargeability under § 523(a)(6) and (4). More specifically, this Court in the first instance must decide whether the Debtor's conduct that mandated exemplary and punitive damages for willful and malicious conduct under the Uniform Trade Secrets Act was willful and malicious for purposes of § 523(a)(6). If so, summary judgment must enter in favor of the Plaintiffs as there will be no material facts in dispute.

In 1998, the United States Supreme Court in *Kawaauhau v. Geiger,* 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998), in its words, "confront[ed] the pivotal question concerning the scope of the 'willful and malicious injury' exception: Does

§ 523(a)(6)'s compass cover acts, done intentionally, that cause injury ... or only acts done with the actual intent to cause injury (as the Eight Circuit ruled)?" 523 U.S. at 61, 118 S.Ct. at 977 (footnote omitted). In holding that "debts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)" 523 U.S. at 64, 118 S.Ct. at 978, the Court stated:

> The word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional *injury,* not merely a deliberate or intentional *act* that leads to injury. Had Congress meant to exempt debts resulting from unintentionally inflicted injuries, it might have described instead "willful acts that cause injury." Or, Congress might have selected an additional word or words, i.e., "reckless" or "negligent," to modify "injury." Moreover, as the Eighth Circuit observed, the (a)(6) formulation triggers in the lawyer's mind the category "intentional torts," as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend "the *consequences of an act," not simply "the act itself."* Restatement (Second) of Torts § 8A, comment a, p. 15 (1964) (emphasis added).

523 U.S. at 61–62, 118 S.Ct. at 977.

In *McAlister v. Slosberg (In re Slosberg),* 225 B.R. 9 (Bankr.D.Me.1998), the bankruptcy court observed that *"In re Geiger* defines 'willful' in a manner significantly at odds with much existing precedent, including that in the First Circuit." *Id.* at 16. The court added: "Lamentably, *In re Geiger* is at the same time silent regarding the meaning of 'malicious,' although its redefinition of 'willful' incorporates much (at first blush some might say all) of what 'malicious' once meant in § 533(a)(6)'s context." *Id.* The court in

*Slosberg* also observed that the Supreme Court did not indicate whether the willfulness element includes "acts intentionally done and which are known by the actor to be '*substantially* certain to cause injury.'" *Id.* at 18 (emphasis in original). Noting that the "substantially certain" formulation had been adopted in most post-*Geiger* decisions, *id.* n. 12, and is prominent in the Restatement (Second) of Torts § 8A, the bankruptcy court in *Slosberg* adopted that formulation. It concluded that "a debtor who intentionally acts in a manner he knows, or is substantially certain, will harm another may be considered to have intended the harm and, therefore, to have acted willfully within the meaning of § 523(a)(6)." *Id.* at 19 (footnote omitted).

Turning to the second prong of § 523(a)(6), malice, the *Slosberg* court stated that "[e]stablishing malice can no longer rest upon demonstrating intent to cause injury as it did in this Circuit prior to *In re Geiger*. Malice must add *something* to the § 523(a)(6) equation. But what?" *Id.* at 20 (emphasis in original). Finding support in the pre-*Geiger* case law, the court concluded that "[a] showing of malice requires a showing that the debtor's willful, injurious conduct was undertaken without just cause or excuse." *Id.* at 21.

Using these formulations as guideposts, this Court turns to the issue of whether the Debtor's violation of the Uniform Trade Secrets Act was willful and malicious. The Act defines misappropriation as follows:

(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(2) Disclosure or use of a trade secret of another without the express or implied consent by a person who:

(a) Used improper means to acquire knowledge of a trade secret; or

(b) At the time of disclosure or use, knew or had reason to know that his or her knowledge of a trade secret was:

(i) Derived from or through a person who had utilized improper means to acquire it;

(ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(iii) Derived from or through a person who owed a duty to the person seeking relief to maintain or limit its use.

R.I. Gen.Laws § 6–41–1(B). "[I]mproper means," according to the Act "includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy...." *Id.* at § 6–41–1(A).

In the present case, the factual findings of the Superior Court made after two days of trial and the opinion of the Rhode Island Supreme Court establish that the conduct of the Debtor and the injury caused by him to the Plaintiffs was "willful and malicious." In its findings, the Superior Court recognized that the causes of action for intentional interference with prospective business relations and tortious interference with contractual relations required proof of "legal malice and intent to do harm...." *McFarland v. Brier*, C.A. No. 96–1007, Slip op. at 11, 2001 WL 1097779. It found that the Plaintiffs' proof of Brier's conduct met these standards. The Superior Court decision establishes unequivocally that the Debtor conspired with Bibeau in the theft of R & L trade secrets and that the Debtor breached his duty as a Certified Public Accountant to maintain the secrecy of the trade secrets stolen from R & L. This Court has no difficulty concluding that the Debtor acted intentionally with the knowledge that R & L was certain to be injured. Indeed, his business plan says as much. Not only did the Debtor attempt to lure customers from R & L using its

trade secrets, he attempted to solicit its sales representatives. Moreover, as the Superior Court found, this conduct was malicious as the Debtor's actions were undertaken without justification.

Furthermore, the Supreme Court of Rhode Island characterized the Debtor's actions as willful and malicious when it determined that the Superior Court abused its discretion in failing to award exemplary damages to punish the Debtor for his tortious and "egregious misconduct." 769 A.2d at 612. In its opinion, the Supreme Court emphasized that Brier used his client's confidential information not just to profit himself but at the same time to harm his client. *See id.* Brier's business plan for CSI establishes that Brier knew that his conduct was substantially certain to injure R & L and indeed did injure R & L. Thus, the Debtor's conduct toward the Plaintiffs satisfies the requirements for nondischargeability for willful and malicious injury under § 523(a)(6).

Numerous courts have concluded that a determination of willful and malicious conduct for purposes of awarding exemplary damages under the Uniform Trade Secrets Act collaterally estops a debtor from relitigating the same issue under § 523(a)(6). For example, in *Dent Wizard Int'l Corp. v. Brown (In re Brown)*, 237 B.R. 740 (Bankr.C.D.Cal.1999), the bankruptcy court determined that the debtor was collaterally estopped from relitigating a judgment arising out of the debtor's misappropriation of trade secrets "in an outrageous manner, with evil motive and/or reckless indifference to the rights of others. . . ." *Id.* at 747. Referring to the finding of evil motive, the court stated that "[s]uch a finding presumably means that Brown's motive was more than simply wrongful, simply for his own gain." *Id.* at 748. According to the court, the debtor's intent to cause evil constituted an intent to injure

the creditor, an "interpretation of the jury's findings . . . bolstered by the jury's decision to award punitive damages. . . ." *Id.*

Similarly, in *Spring Works, Inc. v. Sarff (In re Sarff)*, 242 B.R. 620 (6th Cir. BAP 2000), the Bankruptcy Appellate Panel for the Sixth Circuit examined whether a state court's findings of liability for business torts and grant of punitive damages collaterally estopped the debtor from contesting that the judgment to be excepted from discharge under § 523(a)(6). Prior to the bankruptcy case, the state court had entered a judgment in favor of the debtor's former employer for compensatory damages for breach of a covenant not to compete, interference with business relationships and common law misappropriation of trade secrets, as well as for punitive damages for theft, a fine for violating an injunction and a sanction for redacting information from discovery documents. The state court also entered a judgment against the debtor for compensatory damages for breach of the duty of loyalty. *See* 242 B.R. at 623. Ruling on cross-motions for summary judgment, the bankruptcy court held that the award of compensatory damages for breach of the duty of loyalty was dischargeable but the balance of the judgment was nondischargeable under § 523(a)(6).

Engaging in conduct strikingly similar to that undertaken by Brier and Bibeau, the debtor and a co-defendant in the *Sarff* case conspired to open a competing company while stealing springs, boxes and customers from their employer to further their new enterprise. *See id.* at 625. The appellate panel determined that the bankruptcy court properly held that the punitive damages and compensatory damages for interference with business relations and misappropriation of trade secrets were nondischargeable. It stated that the puni-

tive damages were indicative of a finding of malice. *See id.* at 627. The panel, however, reversed the bankruptcy court's determination that the compensatory damages for breach of the duty of loyalty were dischargeable, finding that the damages arose from the same actions as the other damage awards. *See id.* at 628.

In view of the decisions of the Rhode Island Superior Court and the Rhode Island Supreme Court concerning the Debtor's tortious conduct, the Restatement (Second) of Torts § 8A, and decisions such as *In re Brown* and *In re Sarff,* the Court finds that because the Debtor is collaterally estopped from relitigating the Superior Court Judgment, the Plaintiffs are entitled to summary judgment on Count I of their Complaint. The Court rules that the Debtor's debt to the Plaintiffs is nondischargeable pursuant to § 532(a)(6). Accordingly, the Court need not decide the § 523(a)(4) count.

## IV. CONCLUSION

In view of the foregoing, the Court hereby enters judgment in favor of the Plaintiffs and against the Debtor on Count I of their Complaint. ·Count II is moot.

### ORDER

In accordance with the Memorandum dated February 26, 2002, the Court enters summary judgment in favor of Read & Lundy, Inc. and Cliff McFarland and against the Debtor, Michael Brier on Count I of the Plaintiffs' Complaint. The Court finds that the Debtor's obligations to the Plaintiffs are nondischargeable under 11 U.S.C. § 523(a)(6). Accordingly, Count II of the Plaintiffs' Complaint is moot.