**Clifford McFARLAND et al.**

v.

**Michael BRIER et al.**

**No. 2002–500–Appeal.**

Supreme Court of Rhode Island.

June 21, 2004.

John P. Gyorgy, Esq., Providence, for Plaintiff.

Melissa E. Darigan, Esq., Providence, for Defendant.

Present: WILLIAMS, C.J., FLANDERS, GOLDBERG, and SUTTELL, JJ.

## OPINION

FLANDERS, Justice.

The annals of corporate finance provide us with this fresh illustration of the old saw that "possession is nine-tenths of the law." A bank, the defendant First Bank

and Trust Company (the bank),[1] and a garnishing creditor, the plaintiff Read & Lundy, Inc. and its owner, the plaintiff Clifford McFarland (collectively referred to as Read & Lundy), fell out over a certain certificate of deposit[2] (CD) that the bank issued to the defendant Michael Brier (Brier), a customer of the bank. In 1996, Brier pledged this $200,000 CD to the bank to secure his personal guaranty for a loan the bank issued to Brier's company, the defendant Consigned Systems, Inc. (CSI). Approximately six months later, Read & Lundy caused the bank to be served with a prejudgment writ of attachment for any of Brier's assets in the bank's possession, up to the amount of $100,000. After the bank received the writ, but before the writ matured into a full right of garnishment, CSI defaulted on the loan and the bank applied the CD to pay down a portion of the balance due on the loan.

Thereafter, Read & Lundy asked the Superior Court to charge the bank as garnishee for the full value of the CD. Finding that Brier and the bank had rescinded the pledge agreement, the court ruled that the bank improperly applied the CD to reduce the balance owed on the CSI loan. Consequently, it ordered the bank to pay Read & Lundy $200,000, the full amount of the CD as disclosed in its garnishee's affidavit, plus the accrued interest on the CD.

Because we conclude that the bank held a prior perfected security interest in the CD and that its possessory interest took precedence over Read & Lundy's later-served writ of attachment, the bank did not have to obtain the approval of the Superior Court before liquidating the CD and paying down the balance due on the defaulted CSI loan. Thus, we reverse the Superior Court decision and vacate the judgment in favor of Read & Lundy.

## Facts and Travel

Although this case has a long and convoluted history, it is still but one piece in a jumble of litigation involving one or more of these same parties.[3] These disputes all arose after Dennis Bibeau, the former president of Read & Lundy, joined forces with Michael Brier, an accountant, to create a new company, CSI, that would engage in "head-to-head competition" with Read & Lundy. *See McFarland v. Brier*, 769 A.2d 605, 608 (R.I.2001). The sole issue before us today, however, is whether a Superior Court trial justice properly granted Read & Lundy's motion to charge the bank as a garnishee for the damages judgment that Read & Lundy obtained against Brier and CSI in the underlying litigation.

In March 1996, Read & Lundy filed suit in Superior Court against Brier and CSI,

1. Washington Trust, Inc. purchased the bank in April 2002 and succeeded to its interests.

2. A certificate of deposit is "[a] banker's certificate acknowledging the receipt of money and promising to repay the depositor * * * [or a] bank document showing the existence of a time deposit, [usually] one that pays interest." Black's Law Dictionary 219 (7th ed.1999). In addition, Article 3, of the Uniform Commercial Code, as enacted in Rhode Island, defines a certificate of deposit as: "an instrument containing an acknowledgment by a bank that a sum of money has been received by the bank and a promise by the bank to repay the sum of money. A certificate of

deposit is a note of the bank." G.L.1956 § 6A-3-104(j).

3. This is the third time one or more of these same parties have come before this Court on matters arising out of the underlying factual situation. *See Read & Lundy, Inc. v. Washington Trust Co. of Westerly*, 840 A.2d 1099 (R.I. 2004) (per curiam); *McFarland v. Brier*, 769 A.2d 605 (R.I.2001). In addition, they have also appeared before the bankruptcy court in connection with Brier's personal bankruptcy. *See In re Brier*, 274 B.R. 37 (Bankr.D.Mass. 2002).

alleging that they had tortiously interfered with its contractual relations, misappropriated its trade secrets, disclosed its confidential information, interfered with its prospective business advantage, and committed unlawful trade disparagement. Shortly thereafter, in May 1996, the Superior Court issued a preliminary injunction, enjoining Brier and CSI from marketing competing products or services to Read & Lundy's customers.

In June 1996, the bank extended a $500,000 loan to CSI—guaranteed, in part, by the Small Business Administration (SBA). When the bank loaned CSI this money, it was aware of the pending litigation between Read & Lundy and Brier. Under an agreement that the parties signed, the bank secured the loan by obtaining a security interest in CSI's accounts receivable, inventory, and certain other collateral. In addition, Brier, who was CSI's president and co-founder, personally guaranteed the CSI loan and pledged a $200,000 CD to the bank as security for his personal guaranty of the loan. The bank had issued this CD to Brier earlier that month, marking on its face a legend stating that it was "nonnegotiable" and "nontransferable." The bank obtained security for Brier's personal guaranty via a pledge agreement with Brier that authorized the bank, *inter alia*, to apply the CD to the balance due on the loan if CSI committed any event of default specified in the loan agreement. Upon Brier's executing this pledge agreement, the bank immediately took possession of the pledged CD and exercised dominion and control over it until 1999, when it ultimately applied the CD to pay down the balance due on the defaulted loan.

In January 1997, approximately six months after Brier pledged the CD to the bank, Read & Lundy arranged for the service of a prejudgment writ of attachment on the bank for any of Brier's assets in the bank's possession, up to $100,000. The Superior Court originally issued the writ in September 1996, but that court stayed its effectiveness pending a petition for certiorari to this Court. Upon being served with the writ of attachment, the bank responded by filing a garnishee's affidavit with the Superior Court, saying that it held the CD as security for the CSI loan and indicating that it then valued the CD, with accrued interest, at $206,856.87.

Within a brief period after receiving the loan proceeds, CSI was unable to make loan payments to the bank in a timely manner. As the months passed, its payments often were thirty to forty-five days late. CSI also was in default of several other loan covenants and requirements. In late 1997, the bank began making collection calls to CSI concerning the defaults. For most of 1998, the bank classified the loan as delinquent under its internal rating system, which deemed any loan to be delinquent when the borrower submitted payments that were more than fifteen days past the due date. Because of CSI's outstanding defaults, the bank also placed the CSI loan on a watch list.

In December 1998, after the loan had been in default for several months, Brier contacted the bank and requested that it exercise its rights under the pledge agreement and apply the CD to reduce the principal balance due on the CSI loan. He also asked the bank to re-amortize the loan to reduce the monthly payments and thereby improve CSI's cash flow.

In January 1999, the bank acceded to these requests and applied the CD to pay down a portion of the loan balance. At this time, Read & Lundy's $100,000 prejudgment writ of attachment had not yet matured into a right of garnishment. Indeed, Read & Lundy did not obtain a final judgment against Brier and CSI until Sep-

tember 2001. Although in May 1998, the Superior Court found in Read & Lundy's favor on four of five claims that it asserted against CSI and Brier, various post-trial motions, along with an appeal to this Court, delayed the entry of a final judgment. Once the Superior Court entered a final judgment, however, Read & Lundy asked that court to charge the bank as garnishee.

In July 2002, the Superior Court conducted a two-day hearing on Read & Lundy's motion to charge the bank as garnishee. In a bench decision, the trial justice decided that Read & Lundy's later-served prejudgment writ of attachment was entitled to priority over the bank's security interest in the CD that it held as collateral for the CSI loan. Noting that the bank never sought to declare CSI in default and that it applied Brier's CD to the loan balance only at Brier's suggestion, the trial justice ruled that Brier and the bank effectively had rescinded the pledge agreement. Thus, the trial justice concluded, the bank improperly ignored the writ of attachment when it applied the CD to pay down the CSI loan balance. The trial justice, therefore, ordered the bank to pay over to Read & Lundy the full value of the CD, as disclosed in its garnishee's affidavit: namely, $206,856.87. *See* G.L.1956 § 10–17–7. Thereafter, the court entered a final judgment in favor of Read & Lundy. The bank appealed from this judgment. Read & Lundy also cross-appealed, arguing that the Superior Court improperly calculated the date from which prejudgment interest should run.

The bank contends in its appeal that the trial justice erroneously granted Read & Lundy's motion to charge it as a garnishee with respect to the Brier CD. According to the bank, as a secured creditor, its prior perfected security interest was superior to Read & Lundy's later-served prejudgment

writ of attachment. In addition, the bank suggests, it possessed the contractual right to apply the CD to pay down the balance due on its defaulted loan to CSI, and it posits that Read & Lundy's later-served writ of attachment did not alter these rights in any way. The bank also contends that its common-law setoff rights were superior to Read & Lundy's interests as a subsequent judgment creditor. Finally, the bank asserts, even if Read & Lundy's later-served writ of attachment was entitled to precedence over the bank's prior perfected security interest in the CD, the Superior Court improperly charged Read & Lundy the full amount set forth in its garnishee's affidavit, rather than the lesser amount contained in the writ of attachment.

Read & Lundy argues that it is irrelevant whether the bank possessed a perfected security interest in the CD because the bank had not yet declared the CSI loan to be in default when Read & Lundy caused it to be served with the charging order. Moreover, when the bank applied the CD to pay down the loan, it did so, Read & Lundy suggests, only in response to Brier's request, but not in the exercise of its rights as a secured creditor. Read & Lundy further asserts that this loan paydown amounted to a rescission of the pledge agreement because Brier allowed the bank to apply the CD to the loan balance without first sending him a notice of the loan default and of the bank's intention to apply the CD to enforce Brier's guaranty of the loan. Read & Lundy also argues that the bank did not have a common-law right to set off the loan balance against the CD because there was no mutuality of obligation between the bank and Brier and, in any event, the underlying loan debt had not yet matured. And it also argues that, even assuming that the bank possessed this right of setoff, it could not set off the loan—given the writ of

attachment—without first obtaining the court's permission to do so. Finally, Read & Lundy, as cross-appellant, maintains that the motion justice improperly calculated the date from which prejudgment interest should accrue.

For the unperfected reasons secured and attached below, we reverse, vacate the judgment for Brier, and remand this case to the Superior Court for it to enter judgment in favor of the bank.

## Analysis

■■■ "The findings of a trial justice sitting without a jury are entitled to great weight and will not be disturbed on appeal unless he or she has misconceived or overlooked material evidence, was clearly wrong, or the decision fails to do substantial justice between the parties." *National Hotel Associates ex rel. M.E. Venture Management, Inc. v. O. Ahlborg & Sons, Inc.*, 827 A.2d 646, 651 (R.I.2003). In this case, we reverse the decision of the trial justice because he neglected to accord the bank the rights and protections incident to its status as a secured creditor with a prior perfected security interest in the CD. We hold that the bank perfected its security interest in the CD when Brier executed a personal guaranty of the CSI loan, pledged his CD to the bank to secure his guaranty, and allowed the bank to take possession of the CD.[4] As a result, the bank obtained rights to Brier's CD under the Rhode Island version of Article 9 of the Uniform Commercial Code (hereinafter U.C.C. or the code) that were superior to those of later lien holders, such as Read & Lundy.

Finally, although the bank did not need to obtain judicial approval before it applied the CD to the balance due on the defaulted CSI loan, it should have notified Read & Lundy before doing so. In this case, however, the bank's failure to notify Read & Lundy did not prejudice that party.

## I

### Brier and the Bank Did Not Rescind the Security Agreement After Brier Asked the Bank to Apply the CD Against the CSI Loan

■■■ The trial justice's decision in favor of Read & Lundy turned in large part on his finding that Brier and the bank rescinded the pledge agreement. Rescission of a contract is a bilateral action in which both parties "seek[ ] to create a situation as if no contract existed." *Jakober v. E.M. Loew's Capitol Theatre, Inc.*, 107 R.I. 104, 112, 265 A.2d 429, 433 (1970). It is a "mutual agreement by the parties to an existing contract to discharge and terminate their duties thereunder." *Id.* at 112, 265 A.2d at 434. Having carefully reviewed the record before us, we hold that the parties did not rescind their pledge agreement and that the trial justice was clearly wrong when he so concluded.

Indeed, far from rescinding its rights under the pledge agreement, the bank in fact exercised those very rights when it applied the CD to reduce the balance due on the CSI loan. It is of no consequence to the propriety of the bank's conduct that it exercised its right to apply the CD at Brier's request. A rescission occurs only

---

**4.** The fact that Brier pledged this CD in connection with his personal guaranty of the CSI loan does not affect our analysis. When the bank enforced its security interest against the CD, Brier became an Article 9 debtor and was subject to the same rights and obligations as if he were a direct recipient of the CSI loan funds. *See* G.L.1956 § 6A–9–105(1)(d);

§ 6A–9–102 cmt. 2(a) ex. 4, as amended by P.L.2000, ch. 420, § 6. By treating guarantors the same as debtors, the code "encourages guarantors to participate in commercial transactions, thus facilitating the creation of flexible loan arrangements." *E.g., May v. Women's Bank, N.A.*, 807 P.2d 1145, 1148 (Colo.1991).

when both parties agree to terminate all their contractual duties and responsibilities. *See id.* Here, neither party even proposed discharging their mutual obligations under the pledge agreement. Instead, both parties, in reliance on the pledge agreement, exercised their rights and performed their duties thereunder. As discussed below, the only legal significance of Brier's letter asking the bank to liquidate his CD was to waive Brier's right to receive notice from the bank, as the guaranty required, before the bank applied the CD against the loan balance.

■ In addition, we disagree with Read & Lundy's suggestion that the bank and Brier somehow acted improperly to preclude Read & Lundy from satisfying its writ of attachment. Junior creditors are disadvantaged whenever any senior secured creditor has the foresight to protect itself by perfecting its security interest in certain collateral of the debtor. Although the bank knew about the pending litigation against CSI and Brier when it loaned money to CSI, this knowledge in and of itself did not defeat the bank's prior perfected security interest. Certainly, this litigation caused the bank's loan to CSI to constitute an even riskier credit for the bank. But the bank sought to protect its exposure to the risk of a defaulted loan by taking security interests in CSI's assets and by obtaining a personal guaranty from Brier, secured by his pledge of the $200,000 CD. Hence, we cannot say that Brier and the bank acted improperly—even though Read & Lundy was unable to parlay its later-served writ of attachment into a prior perfected security interest in the CD.

Finally, Read & Lundy has not alleged fraud, collusion, or any other type of improper conduct that would allow us to declare that the bank's security interest in the CD was void. Indeed, we recently held in *Read & Lundy, Inc. v. Washington Trust Co. of Westerly,* 840 A.2d 1099, 1102 (R.I.2004) (per curiam) that the bank did not act improperly in loaning money to CSI, even if it actually used information acquired from a previous loan application when it did so. Based on the foregoing, we hold that the parties in no way rescinded the pledge agreement when the bank applied the CD to reduce the loan balance.

## II

**The Bank's Rights to the CD Under Article 9 Were Superior to Read & Lundy's Writ of Attachment Because the Bank Possessed a Prior Perfected Security Interest**

■ We hold that the bank's rights to apply the CD to the balance due on the defaulted loan were superior to Read & Lundy's writ of attachment because it was a secured creditor with a prior perfected security interest in this collateral. In the world of debtors and creditors, first in time is often first in right. Here, the bank was first in time when it perfected its security interest in the pledged CD by taking possession of this instrument before Read & Lundy served its writ of attachment on the bank.[5]

Initially, we note that U.C.C. Article 9, as it stood before its 2001 revision, governed Brier's pledge of his CD. *See* G.L. 1956 § 6A–9–102(2) ("This chapter applies to security interests created by contract,

---

**5.** The fact that the bank not only issued the CD but also retained a security interest in that same instrument is irrelevant to our analysis. Dwight L. Greene, *Deposit Accounts as Bank Loan Collateral Beyond Setoff to Perfection— The Common Law Is Alive and Well,* 39 Drake L.Rev. 259, 290 n. 146 (1990) ("For the purposes of becoming a secured party with respect to its own debt instrument, several cases establish that a bank can acquire a perfected security interest in its own certificates of deposit.").

including pledge * * *.").   All statutory citations to the U.C.C. in this decision, therefore, are to the version of Article 9 that preceded the 2001 revisions (1992 Reenactment), unless otherwise noted.   But regardless of which version of the code we apply, we conclude that the bank held a prior perfected security interest in the Brier CD. *See* Ben Carpenter, *Security Interests in Deposit Accounts and Certificates of Deposit Under Revised UCC Article 9,* 55 Consumer Fin. L.Q. Rep. 133, 136 (2001) (hereinafter, Carpenter) (collateral classification of nontransferable CDs are the same under both versions of Article 9).

Article 9   of the code, as adopted by § 6A–9–305, codifies the common law of pledge, setting forth the general rule that a secured party obtains a perfected security interest when that party takes possession of the collateral securing a loan. Section 6A–9–305 plainly states that "[a] security interest in * * * instruments * * * may be perfected by the secured party's taking possession of the collateral."   Thus, if Brier's CD qualified as an "instrument" as that term is used in Article 9, then the bank held a perfected security interest when it took possession of the CD. But if the CD constituted some other type of collateral, then the bank would hold only an unperfected security interest because it failed to file a financing statement, pursuant to § 6A–9–302(1).

■   Our first task, therefore, is to determine the collateral classification of this CD. Under Article 9, the CD is either a "deposit account," a "general intangible," or an "instrument."   If the CD was a "deposit account," then Article 9 would not apply to this transaction.   *See* § 6A–9–104(m) ("This chapter does not apply * * * [t]o a transfer of an interest in any deposit account * * *.").   Instead, the common law governing pledges would determine the rights of the bank.   *See Dun-*

*can Box & Lumber Co. v. Applied Energies, Inc.,* 165 W.Va. 473, 270 S.E.2d 140, 143 (1980).   But if the CD qualified as an Article 9 "instrument," then the bank, under Article 9, perfected its security interest when it took possession of the CD. *See* § 6A–9–305.   And if the CD was a "general intangible," as Read & Lundy argues, then the bank could perfect its security interest only by filing a financing statement—an act that the bank concedes it did not perform.   *See* § 6A–9–302(1).

Under the plain language of Article 9, it is readily apparent that the CD was not a deposit account.   Section 6A–9–105(1)(e) defines a "[d]eposit account" as "a demand, time, savings, passbook, or like account maintained with a bank, savings and loan association, credit union, or like organization, *other than an account evidenced by a certificate of deposit.*"   (Emphasis added.) Because the definition of a "deposit account" expressly excludes CDs, the CD at issue here was either a "general intangible" or an "instrument."

Section 6A–9–106 defines a "[g]eneral intangible[]" as "any personal property (including things in action) other than goods, accounts, chattel paper, documents, instruments, and money."   "According to the Official Comment, this category is a 'catchall' intended to bring under Article 9 'miscellaneous types of contractual rights and other personal property which are used or may become customarily used as commercial security.'"   Evan H. Krinick, *Most Courts Classify Nonnegotiable Certificates of Deposit That Also State They Are Nontransferable as "Instruments"; Thus, Lenders May Perfect Their Liens on Such Collateral by Possession,* 117 Banking L.J. 347, 347–48 (2000) (hereinafter, Krinick). The comment lists goodwill, literary rights, trademarks, copyrights, and patents as examples of general intangibles.   *Id.* at 348, 270 S.E.2d 140.   Because this is a catch-all

category, Brier's CD cannot qualify as a "general intangible" if it constitutes an "instrument."

An Article 9 "instrument" is "a negotiable instrument * * * or a certificated security * * * *or any other writing which evidences a right to the payment of money and is not itself a security agreement or lease and is of a type which is in ordinary course of business transferred by delivery with any necessary indorsement or assignment."* Section 6A–9–105(1)(i). (Emphasis added.) Here, neither party contends that the CD qualified as an Article 3 negotiable instrument or an Article 8 certificated security. Therefore, the bank possessed a prior perfected security interest in the CD only if the CD was a writing of a type that could be transferred by delivery with any necessary endorsement or assignment in the ordinary course of business.

Read & Lundy argues that Brier's CD cannot constitute an "instrument" because it bore a legend on its face describing it as "nontransferable." Citing *In re Cambridge Biotech Corp.*, 178 B.R. 34 (Bankr. D.Mass.1995), Read & Lundy contends that this legend was dispositive on the issue of transferability. As such, this CD was a "general intangible," it maintains, and therefore, the bank's failure to file a financing statement caused it to be an unperfected secured creditor.

We disagree with this contention because *In re Cambridge Biotech Corp.* represents the minority view on this issue and its reasoning is against the weight of authority. *See generally* Krinick, at 351 (discussing *In re Cambridge Biotech Corp.* under "Minority View" heading). Instead, the majority of courts have held that CDs stamped "nontransferable" are nonetheless "instruments" for Article 9 purposes.[6] *See* § 6A–9–105(1)(i) (defining term "instrument").

Courts adopting the prevailing view hold that a CD bearing a "nontransferable" legend is an "instrument" under the U.C.C. because it still qualifies as a "writing which evidences a right to the payment of money and is not itself a security agreement or lease and is of a type which is in ordinary course of business transferred by delivery with any necessary indorsement or assignment." *In re Omega Environmental Inc. v. Valley Bank, NA,* 219 F.3d 984, 986 (9th Cir.2000) (per curiam) (citing Va.Code § 8.9–105(1)(i)). The majority of courts so hold even though the CD in question bears a "nontransferable" legend—because such CDs still are, as a matter of law, writings "of a type" that are transferred by delivery in the ordinary course of business with any necessary endorsement. Thus, as a matter of law, "[t]here is no basis in UCC § 9–105(1)(i) for allowing the legend on a writing to control its transferability." *In re Latin Investment Corp. v. Capital Bank, N.A.,* 156 B.R. 102, 106 (Bankr.D.C. 1993). In so ruling, most courts defer to the " 'realities of the marketplace' " rather than " 'narrowly looking to the form of the writing.' " *In re Omega Environmental Inc.,* 219 F.3d at 987. "Almost every court to face the issue has rejected the argument that the language on the certificate is controlling, *i.e.,* if a certificate of deposit bears the legend 'nontransferable' it cannot be 'in the ordinary course of business transferred.' " *Id.* Instead, recognizing that the business world regularly transfers writings bearing the legend " 'nontransferable,' the court should give that practice legal effect

---

6.  *See In re Omega Environmental, Inc. v. Valley Bank, NA,* 219 F.3d 984, 987 (9th Cir. 2000) (per curiam); *In re Latin Investment Corp. v. Capital Bank, N.A.,* 156 B.R. 102, 105 (Bankr.D.C.1993); *In re Kroh Brothers Devel-* opment Co. v. Barnett Bank of Southwest Florida, 101 B.R. 114, 119–20 (Bankr.W.D.Mo. 1989); *Craft Products, Inc. v. Hartford Fire Insurance Co.,* 670 N.E.2d 959, 961 (Ind.Ct. App.1996).

unless doing so is inconsistent with the U.C.C.'" *In re Latin Investment Corp.,* 156 B.R. at 106.

We are persuaded to adopt this prevailing view, not merely because a majority of courts that have struggled with this issue have so concluded, but also because it is in concert with one of the underlying purposes of the U.C.C.: namely, to effectuate customary business practices, not thwart them. *See* G.L.1956 § 6A–1–102(2)(b) & cmt. *See also In re Latin Investment Corp.,* 156 B.R. at 106. We note that the case principally relied on by Read & Lundy, *In re Cambridge Biotech Corp.,* is often criticized because that court made no attempt to effectuate the usual business practices that apply to the transferability of CDs. *E.g., In re Omega Environmental, Inc.,* 219 F.3d at 988 n. 8. Instead, the bankruptcy judge in that case simply said, "I do not agree that the 'realities of business practice' need to be consulted." *In re Cambridge Biotech Corp.,* 178 B.R. at 38. In addition, other cases adopting the minority position are similarly unconvincing because they assume that a CD bearing a "nontransferable" legend means that it is a writing "of a type" that is automatically nontransferable, regardless of the actual business practice that prevails in this area. *See Prudential–Bache Securities, Inc. v. Bartow County Bank,* 187 Ga.App. 530, 370 S.E.2d 751, 752 (1988) (concluding, without analysis, that "'nontransferable'" facial language precluded CD from qualifying as an "'instrument'" under Article 9); *Bank IV Topeka, N.A. v. Topeka Bank & Trust Co.,* 15 Kan.App.2d 341, 807 P.2d 686, 691 (1991) (same).

Instead, we recognize that banks, which are subject to various state and federal regulatory requirements, often stamp their CDs as "nontransferable" for reasons wholly unrelated to their actual transferability in the commercial marketplace. Thus, "[m]ost institutions include a 'non-transferable' legend on their certificates of deposit to avoid classifying the time deposits as transaction accounts under Federal Reserve Board Regulation D, which are subject to different reserve and reporting requirements." Carpenter, at 136 n. 29 (citing 12 C.F.R. § 20.4.2(f)). This is not to say that, in this case, the bank actually labeled the CD as "nontransferable" for reasons relating to such reserve and reporting requirements. But it does show that a "nontransferable" legend, by its very terms, does not necessarily preclude a depositor from transferring the CD to third parties in the ordinary course of business.

Read & Lundy next argues that even if we adopt the majority view, the bank did not present sufficient evidence to establish that CDs, such as this one, that the bank stamped as "nontransferable" were nonetheless transferred and transferable in the ordinary course of business. We disagree because "[t]he question of whether a particular document qualifies as an instrument under the U.C.C. is a question of law." *In re Coral Petroleum, Inc.,* 50 B.R. 830, 837, 838 (Bankr.S.D.Tex.1985) (holding that nonnegotiable note qualified as an Article 9 instrument despite the limits on its transferability). The test for transferability is "what professionals ordinarily would do to transfer an interest in the claim evidenced by the writing in question. Only if they would deliver the writing (with any necessary indorsement or assignment) will the writing be an [A]rticle 9 instrument." Steven L. Harris, *Non–Negotiable Certificates of Deposit: An Article 9 Problem,* 29 U.C.L.A. L.Rev. 330, 372 (1981) (hereinafter, Harris). The rationale behind this rule is that "[i]f professionals who deal with a writing attach importance to possession of the writing, then the law likewise should attach significance to possession." *Id.* This test comports

with the underlying purpose of the U.C.C.: namely, to effectuate existing business practices. Thus, if this CD was pledgeable at common law, it should remain so under Article 9. *See id.* at 373.[7]

Here, the bank obviously attached significance to possession of the CD because it incorporated the holder's possession and endorsement of the CD as a precondition to payment. Aside from bearing the "nontransferable" legend, the CD also stated on its face that "It Will Pay To the Order of Michael Brier * * * *On Return Of This Certificate Properly Endorsed."* (Emphasis added.) By incorporating possession and endorsement of the CD as a precondition to payment, the bank implicitly acknowledged that the CD was indeed transferable. *See First National Bank in Grand Prairie v. Lone Star Life Insurance Co.*, 524 S.W.2d 525, 530 (Tex.Civ. App.1975). Otherwise, why would the bank have required Brier to return and endorse the CD upon seeking payment? "Such presentation is necessary for the bank's protection because lack of possession would indicate that the named owner of the certificate of deposit may have transferred it to a third party." *Id.* Clearly, the principal reason the bank required Brier's possession of the CD as a precondition to payment was to protect itself from claims asserted by potential third-party transferees of the CD. But "[n]o such protection would be necessary if the certificate were not * * * transferable." *Id.* For this reason, we hold, the bank, by expressly incorporating the holder's possession and endorsement as a precondition

to payment, implicitly recognized that Brier's CD was indeed "of a type" that was transferable in the ordinary course of business, notwithstanding the "nontransferable" legend. *See General Electric Co. v. M & C Manufacturing, Inc.*, 283 Ark. 110, 671 S.W.2d 189, 190 (1984) (holding as matter of law that nontransferable CDs were Article 9 instruments); *Citizens National Bank of Orlando v. Bornstein*, 374 So.2d 6, 10 (Fla.1979) (holding, as matter of law, that CDs containing restrictions on transfers were nonetheless Article 9 instruments).

▮ Therefore, because the CD was an instrument that was transferable in the ordinary course of business, we hold that the bank had a perfected security interest in the CD. For this reason, the bank's perfected security interest in Brier's CD took priority over Read & Lundy's later-served writ of attachment. As a secured creditor with a prior perfected security interest in the CD, the bank possessed superior rights to any subsequent lien creditors, including Read & Lundy. Although not expressly stated, the code clearly implies that a secured party with a perfected security interest is entitled to priority over a creditor who has obtained a later lien on the collateral by attachment, garnishment, levy, or the like. *See* James J. Wright & Robert S. Summers, 4 *Uniform Commercial Code* § 33–2 at 278 (5th ed.2002) (commenting that the Code, "by negative implication" states that a perfected secured creditor trumps a later lien creditor). The only time a lien creditor takes priority over a secured creditor is

---

**7.** Other courts have consulted the realities of the marketplace on a case-by-case basis to determine the transferability of so-called "nontransferable" CDs. *See In re Latin Investment Corp.*, 156 B.R. at 106. We reject this *ad hoc* "marketability" test because it would tend to thwart the code's stated purposes of "simplify[ing], clarify[ing], and moderniz[ing] the law governing commercial transactions."

G.L.1956 § 6A–1–102(2)(a). Predictability, clarity, and certainty are the key benchmarks in this area of the law; thus, a bright-line rule deeming CDs to be Article 9 "instruments"— notwithstanding a "nontransferable" legend— better serves these interests than adopting an *ad hoc,* case-by-case rule, which tends to promote uncertainty and additional litigation.

when the lien attaches before the secured creditor can perfect its security interest in the collateral. *See* § 6A–9–301(1)(b) (subordinating an unperfected security interest to the rights of a party who becomes a lien creditor before the secured party can perfect).

■ Here, the bank perfected its interest in the CD when it took possession of the CD in June 1996.[8] Read & Lundy, however, did not obtain a writ of attachment until September 1996, and the writ did not become effective until January 1997. Thus, at the earliest, Read & Lundy obtained a writ of attachment some three months after the bank perfected its security interest in Brier's CD. Because the bank unmistakably perfected its security interest before the Superior Court issued the writ of attachment, let alone before it became effective, the bank's right to apply the CD to the defaulted loan trumps Read & Lundy's later-served writ of attachment.

■ We also note that the bank possessed superior rights to the CD because it had the common-law right to set off the CD against the balance due on the defaulted CSI loan. A bank can exercise its common-law right of setoff when: (1) there is mutuality of obligation between the bank and its customer; (2) the funds against which a setoff is exercised belong to the customer; (3) the money to be set off has been deposited into a general—as opposed to a special, reserve, or trust—account; and (4) the debt owed by the customer to the bank is mature. *E.g., Firstar Eagan Bank, N.A. v. Marquette Bank Minneapolis, N.A.,* 466 N.W.2d 8, 12 (Minn.Ct.App.1991). Here, there was mutuality of obligation because the bank owed Brier the money attributable to the CD and Brier had guaranteed the CSI loan personally—a loan that was in default when the bank set off the CD against the balance due on the loan. *See In re Foutz,* 271 F.Supp. 847, 849–50 (W.D.Va.1967) (holding that bank had right to set off funds in a customer's account against debt that the bank customer had incurred as a surety or guarantor). In addition, Brier indisputably owned the CD, and the money was not in a special or reserve account. Finally, the debt was mature because CSI's repeated late payments and other failures to comply with the loan terms constituted defaults under the applicable loan documents, thereby entitling the bank to deem the entire debt due. *See Frierson v. United Farm Agency, Inc.,* 868 F.2d 302, 304 (8th Cir.1989) (holding that "[f]or setoff purposes * * * a debt [is] due when the bank has the *power* to deem the debt due, not when the bank actually *exercises* that power").

■ Although Read & Lundy served the bank with the writ of garnishment before the bank began making collection calls on the CSI loan, the bank properly exercised its common-law right to setoff. Although a bank does not have to exercise its rights of setoff when garnishment or attachment proceedings begin, *see General Electric Credit Corp. v. Tarr,* 457 F.Supp. 935, 937 (W.D.Pa.1978), it may lose the right to do so if it fails to act before such proceedings are completed. *Baltimore and Associates, Inc. v. Municipal Escrow and Title Co.,* 625 F.Supp. 1271, 1273

8. Needless to say, we disagree with the trial justice's conclusion that the bank failed to perfect its security interest when it failed to mail a notice of default to Read & Lundy before it applied the CD against the balance due on the CSI loan. Instead, § 6A–9–305 plainly states that "[a] security interest in * * * instruments * * * may be perfected by the secured party's taking possession of the collateral." For this reason, the bank perfected its security interest when it took possession of the CD. Thus, its failure to send a notice of default was irrelevant to its status as a prior perfected secured creditor because obtaining that status did not hinge on issuing a default notice.

(D.D.C.1985). Here, the Superior Court issued a writ of attachment in January 1997. Thereafter, the bank applied the CD to the CSI loan in January 1999. As explained previously, this writ of attachment did not mature into a right of garnishment until September 2001—more than two years after the bank exercised its right of setoff. Therefore, although the bank applied the CD to the loan balance after Read & Lundy first caused it to be served with the writ of attachment, the bank plainly exercised its setoff rights before this writ matured into a right of garnishment.

■■■ This result comports with the fact that a "majority of courts have held that a garnishee-bank may exercise its right of setoff against indebtedness which matures after the garnishment writ is served." *Carpenters Southern California Administrative Corp. v. Manufacturers National Bank of Detroit*, 910 F.2d 1339, 1341 (6th Cir.1990) (collecting cases). These courts recognize that a garnishing creditor, such as Read & Lundy, has no greater rights in the assets of a bank's customer than the bank's customer has in those assets. A garnishing creditor steps into the shoes of the bank's customer and it is subject to any claim of the garnishee bank to which the bank's customer also is subject. *Id.* Thus, courts reason, if they allowed a subsequent garnishing creditor to prevail over a bank's right to setoff against its customer, they would afford this creditor greater rights than the bank's customer possesses in such assets that it has placed in the bank's control. *See id.* at 1341–42.

### III

**The Bank Did Not Have to Obtain the Superior Court's Approval Before It Applied the CD Against the CSI Loan Balance**

■■■ We next hold that the bank did not have to seek and obtain judicial approval before applying the CD against the balance due on the defaulted CSI loan. This Court never has addressed whether a creditor with a perfected security interest has to obtain the imprimatur of a court before liquidating the secured collateral that also is subject to a post-perfection writ of attachment. Although prudence might suggest that secured creditors attempt to obtain judicial approval before liquidating collateral subject to a later-served writ of attachment, nothing in the U.C.C. or the common law requires secured creditors to follow this course of action. On the other hand, if a creditor with a perfected security interest improperly liquidates the collateral—for example, by disposing of it in a commercially unreasonable manner—then junior creditors can maintain a cause of action against such a creditor seeking damages for any such misconduct. *See* § 6A–9–507(1); *Liberty National Bank & Trust Co. of Oklahoma City v. Acme Tool Division of the Rucker Co.*, 540 F.2d 1375, 1382 (10th Cir.1976); *Louis Zahn Drug Co. v. Bank of Oak Brook Terrace*, 95 Ill.App.3d 435, 50 Ill. Dec. 959, 420 N.E.2d 276, 280 (1981).

Under the U.C.C., a creditor with a perfected security interest has certain rights and remedies when a debtor defaults under a loan agreement. "Article 9 does not define 'default,' but allows the parties to define the term in their security agreement." *E.g., Jenkins v. G2S Constructors, Inc., 140 N.H. 219, 665 A.2d 354, 358* (N.H.1995). Here, the security agreement between CSI and the bank defined ten potential events of default, including, *inter alia,* late payments, the failure of CSI to furnish specified financial statements, and CSI's failure to achieve certain projected financial results in its business operations.

We disagree with Read & Lundy's contention that the bank somehow voided its

perfected security interest by failing to follow its own internal policies about loans that were in default. In its brief to this Court, Read & Lundy urges that the bank never sent a notice of default to Brier or to CSI and that it instead applied the CD to reduce the CSI loan balance at Brier's request, but not in response to any act of default. Even assuming that all these assertions are true, however, they have no bearing on whether the bank was entitled to apply the CD to the CSI loan balance because CSI was in default when it did so. As mentioned previously, the terms of the security agreement governed the existence of a default. Here, nothing in the security agreement required the bank to notify CSI of the existence of any such defaults before it applied the CD against the loan. And the mere fact that a bank employee testified that the bank applied the CD to the loan—not in response to a default but to Brier's request that it do so—does not change the fact that the bank did so when the loan was in default and that, therefore, it was entitled to do so. Here, notwithstanding Read & Lundy's arguments to the contrary, uncontradicted evidence showed that CSI undeniably was in default under the terms of its loan agreement with the bank when the bank applied the CD to reduce the outstanding loan balance. Accordingly, the bank was entitled to exercise its Article 9 rights and remedies, including those listed in the security agreement, irrespective of its failure to formally notify CSI or Brier about the existence of the defaults before it did so.

Upon CSI's default, the bank, as a pledgee of the CD, was in the same position as it would have been if it had perfected its security interest in the CD by filing a financial statement because it already had taken possession of Brier's CD.

"Following default and the taking possession of the collateral by the secured party, there is no longer any distinction between the security interest which before default was nonpossessory and that which was possessory under a pledge. Therefore no general distinction is taken in this Part between the rights of a nonpossessory secured party and those of a pledgee; the latter, being in possession of the collateral at default, will of course not have to avail himself of the right to take possession under Section 9–503." Section 6A–9–501 cmt. 2.

Thus, upon CSI's default, the bank could have followed one of two paths. Under § 6A–9–504(3), it could have disposed of the collateral in a commercially reasonable manner. Alternatively, § 6A–9–505(2) permits secured parties upon default to perform what is referred to as a strict foreclosure, pursuant to which they retain the collateral to satisfy an obligation—as long as the debtor does not object. Here, by liquidating the CD and applying it toward the balance due on the CSI loan—not only with debtor Brier's acquiescence and approval but also at his specific request—the bank acted properly under § 6A–9–504. *See Roberts v. First–Citizens Bank & Trust Co.*, 124 N.C.App. 713, 478 S.E.2d 809, 813 (1996) (holding that "notice is required under [9–504(3)] to debtors who provide instruments as collateral before the secured party collects under those instruments upon default").[9]

Section 6A–9–504(1) permits "[a] secured party after default [to] sell, lease, *or otherwise dispose of any or all of the*

**9.** We recognize that the Third Circuit reached the opposite conclusion in a 1976 case. *In re Copeland*, 531 F.2d 1195, 1207 (3d Cir.1976) (holding that secured party's act of liquidating stocks and using money to pay down loan fell under § 9–505(2), not § 9–504 of the U.C.C.). Although we consider the *Roberts* opinion to be more persuasive than the analysis in *In re Copeland*, our conclusion would be identical under either § 6A–9–504 or § 6A–9–505.

*collateral.*" (Emphasis added). In addition, "every aspect of the disposition including the method, manner, time, place, and terms must be commercially reasonable." Section 6A–9–504(3). When a secured party temporarily retains collateral before liquidating it and then applies the proceeds of the collateral to reduce the debt, that party "otherwise dispose[s] of * * * collateral" under § 6A–9–504(1). *See Roberts,* 478 S.E.2d at 813.

Nevertheless, nothing in § 6A–9–504 or any other section of Article 9 required the bank to obtain judicial approval before it liquidated the Brier CD in partial satisfaction of the balance due on the CSI debt. Indeed, the bank could have conducted a public sale of the CD without first obtaining judicial approval to do so. Section 6A–9–507(2) explains that: "A disposition which has been approved in any judicial proceeding * * * shall conclusively be deemed to be commercially reasonable, *but this sentence does not indicate that any such approval must be obtained * * * nor does it indicate that any disposition not so approved is not commercially reasonable.*" (Emphasis added.). Hence, even though the bank might have been well-advised in light of the later-served writ of attachment to obtain prior judicial approval of its proposed course of action to validate the commercial reasonableness of applying the CD against the defaulted CSI loan, it still was free to liquidate the CD on its own, albeit at its own risk if a court later decided that it was not entitled to do so, or that the method it used to liquidate the CD was not commercially reasonable.

In addition, Article 9 expressly provides that when a debtor is in default, a secured creditor may look to the remedies provided to address that contingency in the security agreement. *See* § 6A–9–506. Here, the security agreement expressly provided that, in the event of default, the bank had

"the right to setoff, without notice to the Debtor, any and all deposits or other sums," including "a certificate of deposit." In addition, the agreement further provided that the bank "may * * * setoff against all or any part of the Obligations, irrespective of whether the Collateral therefor is considered by the Secured Party to be adequate, at any time, *whether or not the Obligations are then due.*" (Emphasis added.)

The factual wrinkle in this case, however, is that the CD was also subject to a writ of attachment at the time the bank applied it to pay down the CSI debt. Read & Lundy correctly cites the general rule "that an attachment 'creates a lien on the property attached which is held in the **custody** of the law to satisfy such judgment.'" *In re Gibbons,* 459 A.2d 938, 939 (R.I.1983) (quoting *Everett v. Cutler Mills,* 52 R.I. 330, 333, 160 A. 924, 925 (1932)). And we also agree that "[a] debtor who has had his property attached cannot defeat that attachment by conveying the property to a third party. Based on fundamental priority rules, the result of such a conveyance is that the third party takes subject to the attachment." *Id.* at 939–40.

Thus, a garnishee bank acts at its own peril when it transfers attached property to an adverse claimant without a proper court order authorizing it to do so. *See Nielsen, Stock & Blackburn v. Financial Acceptance Corp. of Minnesota, Inc.,* 299 Minn. 81, 216 N.W.2d 693, 697 (1974). But a garnishee may discharge prior liens on the garnished property, especially when it is necessary to protect its own interests. *Walker v. Paramount Engineering Co.,* 353 F.2d 445, 448 (6th Cir.1965). In that event, "[l]iability does not attach [when] the garnishee pays the debt to discharge a lien superior to the garnishment lien." *Id.*

A garnishee, therefore, may properly or improperly dispose of the collateral that is subject to a writ of attachment. And if it improperly disposes of the garnished property, then "the third party takes subject to the attachment," and the garnishee will be subject to liability. *In re Gibbons,* 459 A.2d at 940. By implication, these cases indicate that a garnishee, especially one holding a prior perfected security interest in the garnished collateral, need not obtain a court order before it transfers the collateral subject to the attachment for that transfer to be valid. This is so because when the collateral is subject to a prior perfected security interest, there is nothing for the writ to attach and hold to the extent of that interest. Therefore, we hold that the bank did not act improperly when it applied the CD to pay down the CSI loan balance.

In sum, neither Article 9 nor the applicable case law involving garnishment requires a secured creditor with a perfected interest in the collateral to obtain prior judicial approval before the creditor liquidates the collateral that is subject to a later-served writ of attachment. Read & Lundy has not cited a case, statute, or other legal authority to the contrary. Although we are sympathetic to its argument, and agree that prior judicial approval may well be the more *prudent* course to avoid post-liquidation litigation, we cannot say that the bank acted improperly in exercising its self-help right to liquidate this collateral.

The situation here is analogous to a bank's foreclosure of mortgaged real estate pursuant to a power of sale in which, "according to the mortgage instrument and a state statute, the mortgaged property is sold at a nonjudicial public sale by a public official * * * without the stringent notice requirements, burdens, or delays of a judicial foreclosure." Black's Law Dictionary 658 (7th ed.1999). This power-of-sale foreclosure "is not imbued with state action," but "is a privately created contractual remedy analogous to the self-help repossession remedy afforded secured creditors under § 9–503 of the Uniform Commercial Code." *Northrip v. Federal National Mortgage Association,* 527 F.2d 23, 32 (6th Cir.1975). In this state, the General Assembly has authorized a statutory power-of-sale foreclosure under G.L. 1956 § 34–11–22. *E.g., Beaufort v. Warwick Credit Union,* 437 A.2d 1375, 1376 (R.I.1981). Given the similarities between the self-help remedies prescribed in Article 9 and power-of-sale mortgage foreclosures, we hold that there is nothing inequitable or inherently unfair in holding that the bank did not need to seek and obtain prior judicial approval before it liquidated the CD that it held as collateral for the defaulted CSI loan.

■ Our holding that the bank did not need to obtain prior judicial approval before liquidating the collateral for the CSI loan does not mean that Read & Lundy, as a junior creditor, was required to sit idly by if the bank's disposition of such collateral did not occur in a commercially reasonable manner. Indeed, we observe that the bank may have liquidated the CD without properly notifying Read & Lundy of same and, therefore, to that extent, it proceeded in a manner that did not satisfy this standard. Section 6A–9–504(3) requires secured parties to send notice to "any other secured party from whom the secured party has received (before sending his or her notification to the debtor or before the debtor's renunciation of his or her rights) written notice of a claim of an interest in the collateral." That is, the secured party initially must send written notice to the debtor, unless, after default, the debtor has signed a statement renouncing this right to notice of the pro-

posed action to liquidate the collateral. Here, Brier's letter requesting the bank to retain his CD as a setoff against the CSI loan constituted a waiver of his right to receive such notice.

■ But the code also required the bank to send notice to Read & Lundy of the proposed liquidation of the Brier CD because the service of the writ of attachment occurred before Brier renounced his right to notice. Although the bank sent notice to the Small Business Administration before applying the CD to the CSI loan balance, it did not send any such notice to Read & Lundy, whose writ of attachment indicated that it was a subsequent lien holder vis-à-vis the CD. Indeed, at oral argument, the bank conceded that the only notice it ever provided to Read & Lundy was in its garnishee's affidavit, which it submitted on January 29, 1997, almost two years before Brier renounced his rights to receive notice of the liquidation. Moreover, Read & Lundy asserts that it was unaware that the CD no longer existed when it filed its motion to charge the bank as garnishee. Thus, Read & Lundy would have the right to recover from the bank any loss caused by the latter's failure to provide it with proper notice of its proposed application of the CD to pay down the CSI loan balance.[10] See § 6A–9–507(1). But based on our decision today, it appears to us that the bank's failure to provide Read & Lundy with proper advance notice of the bank's proposed liquidation of the CD did not prejudice Read & Lundy or cause it to suffer any damages. Indeed, to the extent that such notice might have prompted Read & Lundy to initiate litigation over the bank's proposed application of the CD to the CSI loan balance, the same result

that we are reaching today would have been the ultimate outcome of that litigation.

■ Finally, even if the bank did not apply the CD to the loan in its capacity as a creditor with a perfected security interest, it was entitled to do so under its common-law right to setoff, without obtaining prior judicial approval. Setoff is " 'an extrajudicial *self-help* remedy based on general principles of equity.' " *Maines Paper & Food Service–Midwest, Inc. v. Regal Foods, Inc.*, 100 Ohio App.3d 454, 654 N.E.2d 355, 359 (1995). (Emphasis added.) It allows a bank to apply the assets of a customer that are in its possession against the customer's matured debt. *Id.* Because the right to setoff is a self-help remedy, secured creditors generally do not need to obtain court orders to implement this right. Although a bank certainly may be liable after the fact for a wrongful act of setoff—just as it would be for liquidating collateral in a commercially unreasonable manner without affording junior creditors notice—banks are free to exercise this right of setoff without first obtaining judicial approval to do so, subject to the risk of liability if they fail to act in a commercially reasonable manner.

### Conclusion

Based on the foregoing analysis, we reverse the decision of the Superior Court, vacate the judgment in favor of Read & Lundy, and remand this case for that court to enter a judgment in favor of the bank consistent with this opinion. Because of our decision on this issue, we need not address the parties' remaining arguments pertaining to prejudgment interest and to whether the Superior Court properly

---

**10.** The bank also would not have satisfied this notice requirement if its liquidation and *setoff* amounted to a sale or disposition of the collateral. *See* § 6A–9–505(2) ("notice shall be sent to any other secured party * * * ").

awarded damages to Read & Lundy for the full value of the CD, as set forth in the garnishee-bank's affidavit.

Justice FLAHERTY did not participate.